STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. BENTLEY BOOTERY, INC., MOE FRED TENZER, JACK KRAMON, NATHAN STRAUSS AND EDWIN J. SWANSON, PLAINTIFFS IN ERROR.

Submitted May 7, 1942—Decided August 1, 1942.

Before BROGAN, CHIEF JUSTICE, and Justices PARKER and PORTER.

For the defendant in error, *William A. Wachenfeld,* Prosecutor of the Pleas of Essex County, and *C. William Caruso,* Special Assistant Prosecutor.

For the plaintiffs in error Bentley Bootery, Inc., and Moe Fred Tenzer, *Kessler & Kessler* (*Samuel I. Kessler,* of counsel).

For the plaintiff in error Edwin J. Swanson, *Child, Riker, Marsh & Shipman* (*Irving Riker,* of counsel).

For the plaintiff in error Nathan Strauss, *John J. Clancy.*

BROGAN, CHIEF JUSTICE. The plaintiffs in error Bentley Bootery, Inc., Moe Fred Tenzer, Nathan Strauss and Edwin J. Swanson were convicted of conspiracy to defraud the Pennsylvania Fire Insurance Company of certain moneys claimed to represent a loss sustained by Bentley Bootery, Inc., under a policy of insurance issued to it by the insurance company. The overt act, the perpetration of which is charged to the individaul defendants, consisted in causing the basement premises occupied by Bentley Bootery to be flooded with water, the intention being to destroy or damage approximately 2,000 pairs of shoes covered by the insurance policy. Thereafter the corporation and Moe Tenzer, its secretary, executed a proof of loss amounting to $5,450.50 which was paid by the insurance company. One Jack Kramon, employed by Bentley Bootery as manager, was also indicted with the others mentioned. There was a severance in his case and he testified for the state. The plaintiffs in error will be referred to as defendants.

Bentley Bootery was fined $1,000 and the individuals Tenzer, Strauss and Swanson each received a prison sentence and a fine. Separate writs of error were sued out, one for Bentley Bootery and Tenzer, another for Strauss, the third for Swanson.

The defendants having caused the entire record of the proceedings had upon the trial of the cause to be returned with the writ in accordance with *N. J. S. A.* 2:195-16, the case is before us on assignments of error and specification of causes for reversal, seventy-five in number, which are argued under several main points.

The facts that appear from the proofs are as follows: Bentley Bootery, Inc., conducted a shoe store at 785 Broad

Street, Newark, New Jersey. Tenzer was the manager, Kramon his assistant. The following persons were employed as salesmen: Goldberg, Greenberg, Hilliard, Kessner, Perlstein and Belfus; one Johnson was the porter; Joan Cullen Safier was the cashier and her sister, Doreen Cullen, a temporary employee. The defendant Strauss was an employee of Goldsmith & Freund, insurance brokers, who sold the policy of insurance to Bentley Bootery; Swanson, an employee of the Underwriters Salvage Company of New York. The premises occupied by Bentley Bootery consisted of a store at street level and a basement, used for storage, in which were located two wash rooms. On July 12th, 1940, the cellar was flooded with water to a depth varying from one and a half to several inches. It was the contention of the state that the cellar was flooded by design of some of the parties defendant and that much of the merchandise was damaged by having water poured over it by some of the defendants or at their direction. It was also charged that the claim paid by the insurance company included damage to merchandise which had not in fact been damaged in order to defraud the insurer. It appears that on July 11th, 1940, between half past six and seven o'clock in the evening a heavy rain fell. It is also undisputed that an adjoining cellar was flooded by the storm. The rain on that evening, however, ceased at seven o'clock.

The substance of the testimony in support of the indictment is that the defendants by fraud caused the damage to the stock of shoes, that they caused obsolete stock to be damaged by water, in which such stock was intentionally placed; that merchandise on shelves, out of reach of the water, was deposited on the basement floor in the water; and that outmoded merchandise was brought from the company's nearby warehouse for the purpose of placing it in the flooded cellar, in order to collect damages from the insurer. The defendants denied that the damaged stock was obsolete but claimed it was new; denied there had been any deliberate wetting of merchandise; testified that the stock from the warehouse was for the fall trade and that for a period of several days it had been brought over to the store premises and placed in

boxes, end up, on the basement floor for sorting as to size, color and style, preparatory to placing such merchandise on sale when the summer season was over. The quantity of water in the cellar was explained by the defendants as resulting from a faucet in one of the washrooms which had negligently been left running; that the drain in the washroom basin was sluggish which caused an overflow. The state contended that the tap had been deliberately left open and that the damage caused thereby was small in comparison with that resulting from the deliberate saturation of merchandise by Tenzer, Goldberg, Greenberg, Kramon and Hilliard; that these persons had put merchandise, which had been deposited on shelves above the water, into the water to accomplish its damage or destruction as footwear. On all these matters a sharp fact issue arose.

Strauss was charged by the state with having participated in the fraud in that he assisted in preparing the claim to the insurance company with knowledge of the conduct outlined above, and Swanson, whose duty it was to salvage merchandise, was charged with knowledge of the conduct already mentioned in spite of which he removed merchandise for the account of his employer, the salvage company, in excess of that which might have been legitimately damaged. Tenzer paid him $100, which Swanson admitted receiving, saying, however, it was for co-operation in clearing away the damaged merchandise. Goldberg, Greenberg and Hilliard were not indicted so far as the record discloses. They testified for the state. Goldberg and Hilliard were each paid a sum of money five or six months after the date of the flood, the former $750, the latter $450. About that time they left the company's employ.

Turning to the brief—(the case was not argued)—the first point for the plaintiffs in error challenges the court's charge to the jury in which, among other things, the court said:

"The first incident that occurs to my mind at the moment is this incident in which Goldberg received $750. What your conclusions may be in regard to that incident I am not able to say, but I think it is a fair inquiry to consider in view of all the circumstances whether or not Goldberg would have

received $750 if there had not been something wrong about this water damage collection  *  *  *.  Next we come to Hilliard.  Now Hilliard received $450 and I think it is a fair inquiry or subject of consideration as to whether he would have been given $450 if there had not been something wrong with this water damage claim."

The argument is that this excerpt from the charge was contrary to the evidence, was not even supported by any evidence in the case, "was misleading to the jury and constituted prejudicial error."  As to this it is sufficient to say that there was testimony offered by the defendants to sustain the inference that Goldberg, Greenberg and Hilliard were endeavoring to extort money from the owner of the shoe company.  Indeed the theory of the defense was that these individuals had threatened Tenzer that a report of the damage claim and the facts connected therewith would be made to the Prosecutor of the Pleas of Essex County unless they were paid to keep silent.  A letter written by Greenberg to Tenzer, produced by defense counsel on the cross-examination of Greenberg bears this out.  The defendants insinuated and perhaps argued to the jury that the prosecution was the result of their refusal to submit to blackmail.  It is true there was no testimony by anyone that the payments made to the individuals mentioned above were bribes, but that they were such, from all the circumstances, was a legitimate inference as will presently appear.

The witness, Goldberg, was discharged on November 20th, 1940.  He was a member of a union, had some status in his organization, and was known as a "store steward," which meant that he represented the employees and the union at the place of his employment.  Grievances were submitted to him by his fellow employees.  Hilliard about this time (November) had previously been dropped from employment or had resigned.  Subsequently he returned to the employ after Goldberg had resigned or been discharged.  Goldberg says he agreed to resign if paid a certain sum.  He asked for a year's salary but accepted the sum of $750, which was considerably less.  His average earning at Bentley Bootery was between $55 and $60 a week.  He explained the amount

received by him thus: "I received $45 for one week, I was the assistant manager, when he [Tenzer] asked me to resign as assistant manager. I received two weeks at $35 a week for being discharged and I received $635 as a bonus." When asked why he was entitled to a bonus he replied: "Mr. Nathan Tenzer called that a bonus until I could get myself another job for my honesty and integrity and my good work in the store." Hilliard, when asked to explain why he got $450, told a different story. He did not claim that it was in settlement for his discharge but said: "As Mr. Tenzer explained to me, he said to me on the night of the fifth, 'I realize you have gone to a lot of trouble because of me and I realize you did avert a strike in my store and you did have a lucrative position and inasmuch as I did inconvenience you, I feel that if I give you a few months' salary perhaps you would resign again.'" Goldberg refers to the payment as a bonus; Hilliard says it was in recognition of his services in averting a strike.

To return to the argument: this excerpt from the charge may not be considered as something separate and apart from the balance of the charge or from the evidence in the whole case. The court very fully instructed the jury that they and they alone were to judge the facts and that the court's opinion on any fact was not binding upon them. Furthermore, the explanation of these two witnesses as to why they received the money from the defendant corporation must be considered along with other testimony by other witnesses in the case. For instance, the witness, Louis Sklarey, lieutenant of county detectives, testified to receiving a letter on January 28th, 1941, signed "John Wilson" relating that there had been a "fraudulent [sic] fraud in the Bentley shoe store; that it was perpetrated by Mr. Tenzer, the owner, with the aid of his manager and some of his employees." This letter, signed with the name Wilson, was admittedly written by Bernard Greenberg. He had written a letter previously to Nathan Tenzer. In it he most assuredly threatened Tenzer. He spoke of the fraud on the insurance company; that his patience was exhausted and delivered an ultimatum—"I either hear from you within twenty-four hours or would you

rather hear from our prosecutor?" It requires little imagination to know what he meant.

A jury is not bound to believe the testimony of any witness, in whole or in part. They may reject what in their conscientious judgment ought to be rejected and accept that which they believe to be credible. So in the instant matter it was altogether within the jury's province, while they accepted as fact that money payments were made to Goldberg and Hilliard, to reject the explanation advanced by those men for the payments made to them. In the circumstances surrounding this phase of the case we do not consider that the charge of the judge in the particular complained of was error.

It is next said that the court erred (a) in refusing a mistrial and (b) in declining to instruct the jury, then and there, while a witness was under interrogation, to disregard certain remarks of counsel in an argument made concerning proffered testimony. The Assistant Prosecutor in charge of the trial of this case, Mr. Fox, asked witness for the state, Greenberg, on direct examination, this question: "Now can you tell me whether or not you participated in any other floods at the Bentley Bootery?" An objection to the question was sustained. The question was manifestly improper and the court's ruling should have ended the matter. But counsel for the state persisted and reframed the question in this form: "Can you tell me whether or not a flood occurred in the cellar of the Bentley Bootery on or about April 8th, 1938?" The question was overruled. Then ensued a long argument, the state's attorney contending that such evidence was admissible as an exception to the *res inter alios acta* rule. The defense argued that in the course of the discussion the remarks of the state's attorney, in support of his question, were prejudicial because made in the presence of the jury. The learned trial judge then and there without request so to do instructed the jury to disregard the remarks of counsel. The court's admonition to the jury at that juncture was complete and eminently fair to the defendants. Immediately upon such instruction the trial judge asked defense counsel if the jury should not be excused for the balance of the argument. The offer was not accepted by defense counsel, who

pursued his argument in the jury's presence—going into a detailed exposition of the matter. Counsel for defendant Swanson and counsel for defendant Strauss continued the argument for their clients, after which the court again remarked that the jury ought to be excused but counsel for the last mentioned defendant took the position that "the harm has been done." Then the court on its own motion excused the jury for the balance of the argument. A motion for mistrial was denied. The defense counsel requested the court to instruct the jury, on the return of that body to the court room, to disregard the remarks of the state's attorney concerning prior floods at Bentley Bootery. This the court consented to do but reserved performance until the time arrived to charge the jury at the end of the whole case. It was then done. The fact that the court did not so instruct the jury instanter is assigned and argued for error. But in the circumstances we do not consider the ruling of the court as erroneous.

In considering this argument we deemed it of sufficient moment to state in detail exactly what happened at this juncture of the trial. The exposition of the facts and circumstances, we think, dissipates the argument that the action of the trial court resulted in manifest harm and injury to the parties on trial.

Whether a mistrial should be granted or not is largely a matter for the sound common sense of the trial judge. There was no abuse of discretion here. Judge Flannagan, who presided at this trial, was eminently fair to the defendants collectively and individually and in the situation depicted went to some lengths to protect the rights of each of them.

Assignments of error Nos. 3 and 8 are argued under the third point. It is said that the court should have ordered a mistrial when so requested because of an article appearing in a morning newspaper published in the City of Newark, while the trial was in progress. The story in the newspaper recited the testimony proffered by the state's attorney and overruled by the court concerning the flood in the Bentley Bootery establishment in 1938, and the like. The court refused to declare a mistrial because of the newspaper story

and also refused to poll the jury on whether or not the jurors had read the article. The court felt that polling the jury would attract attention to the news story, thus giving the article importance it did not deserve. We do not consider that the polling of a jury in the circumstances would have served any useful purpose. The trial judge particularly instructed the jury to disregard any and all newspaper articles and also honored a request to charge to that effect. His action in the premises was proper and consistent with our rulings on matters of this kind. *Cf. State* v. *Overton,* 85 *N. J. L.* 287; 88 *Atl. Rep.* 689; *State* v. *Steneck,* 118 *N. J. L.* 268; 192 *Atl. Rep.* 381; *affirmed,* 120 *N. J. L.* 188; 198 *Atl. Rep.* 848. Before leaving the point we observe, parenthetically, that if a trial judge were bound to declare a mistrial because of what a newspaper prints it would be well nigh impossible to complete a criminal trial of any public importance since newspapers, as a rule, publish stories of all trials, especially if the person on trial or the offense for which he is tried be of public interest.

Under the next point, assignment of error and specification of causes for reversal No. 27 is argued. It states that error resulted from the questions put by the court to the witness, Kramon. It is not necessary to reproduce the questions and answers. The questions put, if propounded by the state's attorney, in rebuttal might have been allowed or disallowed in the discretion of the court. They would not be reason for reversal unless they constituted an abuse of discretion. As we understand the argument for the plaintiffs in error, it is that this information which the court wanted at the close of the case should have been brought out on direct examination and not on rebuttal. This, as we have said, was a matter resting in the court's discretion. We cannot see that the discretion was abused or that defendant suffered wrong or injury in its exercise. Compare *State* v. *Napolitano,* 95 *N. J. L.* 546, 549; 113 *Atl. Rep.* 237.

It is further said under this point that defense counsel felt he ought not to object to questions put to the witness by the court because that might prejudice his cause in the eyes of the jury. There is no substance here. It was for counsel to decide whether he would object or not.

Assignments and specifications argued under the next point, the fifth, are directed to the proposition that the court erred in refusing to direct a verdict at the end of the state's case and at the end of the entire case as to Swanson, and under the next point that the verdict was against the weight of the evidence. Our view is that there is no question but that the matters and things produced in proof as to Bentley Bootery and Mr. Tenzer were for the decision of the jury and that the court could not properly have taken these issues from the jury when we consider the state of the proofs. With regard to Swanson, he, too, in our judgment, falls into the same category. Representing the salvage company, he was sent to take away 1,200 pairs of shoes. As a matter of fact, he took away 1,900 pairs. He admitted receiving $100 from Tenzer. He and Tenzer say it was compensation for co-operating with the owner in clearing the premises of damaged goods so that business might not be inconvenienced. These facts and circumstances, coupled with the testimony of knowledge on his part as to what was going on at the time and place of the flood, makes his case a matter for the jury.

A separate brief was filed for Strauss. The first four points challenge the evidence as insufficient to convict him. The contention is that the court erred in rejecting a motion for direction of verdict at the end of the state's case and in refusing a like motion at the end of the entire case; that there was no legal evidence to support the conviction of Strauss and that the verdict was contrary to the weight of the evidence. Two other points are made (namely, the matter of other floods in the Bentley Bootery premises and the newspaper article mentioned, because of which mistrial was requested) but both of these questions have been discussed and disposed of, *supra*. It is true that the case against this defendant is weak when compared to the strength of the evidence against the other defendants. The jury nonetheless found him guilty because they must have concluded that he knew that Tenzer and the others were engaged at the time in a fraud against the insurance company and that he took some part in it either by failing to inform his principals or by assisting Tenzer in the preparation of the fraudulent

claim, or both. Such a finding on the jury's part was legitimate from all the evidence.

The testimony of Goldberg, Greenberg and Hilliard was that he (Strauss) was in the cellar at the time these several acts in furtherance of the fraud were being done but that this defendant was in the front of the cellar, whereas the wetting down of the merchandise took place in the back of the cellar. The testimony of Kramon, too, places Strauss in the cellar although he does not say exactly where. This witness said he didn't know "whether Mr. Strauss was dipping shoes" but that he was positive he was there. Our conclusion is that the evidence is sufficient to support the verdict as to Strauss.

On consideration of the final argument, we do not think there is any merit at all in the point that the verdict generally is contrary to the weight of evidence. The defense theory was that Goldberg, Greenberg and Hilliard were trying to blackmail the defendant company. Regardless of that and even viewing their testimony with suspicion, nonetheless in the light of the surrounding facts and circumstances which corroborate the story of these witnesss, a case is made out that cannot be rejected. The testimony of Kramon is to the same effect. His testimony of course implicates him as a principal in the fraud. The letter from Greenberg to Lieutenant Sklarey, signed with the name "John Wilson," started the investigation. Sklarey interviewed all those who were employees of the company at the time of the incident. Kramon told him a very complete story. So did the others. Greenberg says that on the morning in question the shoes on the shelves in the basement were about six inches from the cement floor; that the lowest shelving in the basement was two inches above the floor; that he started taking stock; that it was all obsolete stock; that Alexander Johnson brought two cases of shoes from the warehouse on each trip, pushed these cases down on to the basement floor which was then under water; that the shoes brought from the warehouse were obsolete; that he saw Tenzer and Goldberg pulling boxes of shoes out of cases, piling them up in the basement, midway between the front and rear; that shoes were piled up against the wall so water could seep through the

boxes; that water was poured over boxes of shoes; that the tap in the washroom was running even then; that when he came to the store and thereafter went to the basement and saw it flooded with water, Mr. Tenzer called him back and told him "to wait until the boys came in." It was thereafter, or about 9:30 A. M., that he was asked to help out in the basement; that he saw Strauss in the cellar and later Swanson; that Goldberg and Swanson were drinking liquor in the cellar at about 1:30 P. M., to ward off a cold that might develop from wet feet; that when he left the store on the previous evening there were no boxes of shoes on the floor of the basement so far as his recollection went, and that about 1,500 pairs of shoes were dipped in water or had water put on them during the morning and afternoon of July 12th, most of which merchandise had come from the warehouse; that he himself had dipped 100 pairs of satin shoes and that up to the time he took these shoes out of the bins they were not wet. It further appeared that he wrote a letter to Nathan Tenzer threatening to go to the office of the Prosecutor, in which he said, "If you are not acquainted with the work I was directed to do I shall tell you. I dipped over one thousand pairs of shoes as per directions. My patience has reached the point where I either clear myself with the insurance company or have an understanding with you * * *." The witness, Greenberg, signed the letter, which concluded by giving Mr. Tenzer twenty-four hours to act after its receipt.

Another witness for the state, Stanley Goldberg, an employee of the shoe company, corroborated the story of the previous witnesses. He said that by order of Kramon and Tenzer obsolete stock was brought from the warehouse that morning by Johnson, the porter, who threw shoes downstairs, Tenzer instructing him to "take them out of the cartons and put them in the water;" that buckets were used to wet some of the shoes; that Moe Tenzer threw water over the boxes. It serves no purpose to detail his corroboration further.

The next witness, Jack David Kramon, who turned state's evidence, said he was the last to leave the store on July 11th. Before he left Miss Cullen called his attention to a leak in the cellar. There was an inch or two of water in the cellar then;

that he called Moe Tenzer in New York and Tenzer said he would call him back in an hour or less. Tenzer did call and told him to close up. The next day he came to work at 10:30 in the morning. Tenzer, Strauss and Goldberg were in the basement at the foot of the staircase. There were no shoes on the cellar floor when this witness had left on the preceding night. Tenzer instructed the witness to see to it that Johnson brought the rest of the shoes from the warehouse. When he went to the basement there were quite a number of shoe boxes on the floor. Tenzer, referring to a certain type of shoe, said, "You might as well get rid of these, too," with the result that that class of stock was put on the floor. The persons he named as doing the wetting of the shoes were Tenzer, Goldberg and Hilliard. Strauss was present but the witness was not sure whether he was dipping the shoes; he was positive Strauss was present while it was being done; that Tenzer told him not to let other persons into the basement. When he entered the basement in the morning the faucets in both sinks were open and water was flowing from each. No effort was made to turn them off although Tenzer was present.

Lawrence Dameron, an insurance adjuster, testified he was assigned to investigate and adjust loss at the Bentley Bootery for the Pennsylvania Fire Insurance Company; that he went to Newark about noon. On arriving at the basement, water covered the floor to a depth of three-quarters of an inch to an inch. He said there were about 1,200 or 1,300 pairs of shoes in wet boxes and he arranged with Swanson of the Underwriters Salvage Company to take them away for drying and salvage. He called the salvage company and stated the quantity of shoes to be taken, totaled about 1,200 pairs. Strauss was at the store, in the basement, and they left together. Subsequently he received a detailed statement of the inventory signed by Swanson and Tenzer. The inventory which this witness received was for 1,900 pairs of shoes.

The witness, Hilliard, testified that Tenzer told him to take shoes off the shelves and put them on the floor, which he did. These were obsolete stock. He corroborated the testimony about merchandise being brought from the warehouse and put on the basement floor.

For the defense, Nathan Strauss testified that he reached the premises between half past ten o'clock and noon on July 12th; that Moe Tenzer was waiting for him. He denied he had participated in any fraud.

Swanson testified that he was sent to the establishment to pick up shoes; that Tenzer was anxious to get the place cleared out; that he estimated there were between 1,200 and 1,300 pairs of shoes on the floor; admitted getting $100 from Tenzer but said that the money was for co-operation in getting shoes out of the basement; denied seeing anybody wetting or dipping shoes; that he was unaware of any conspiracy by anyone.

The next witness, an employee of a neighboring concern, said that considerable water had flooded their basement the evening before and damaged some merchandise; that there was at least two inches of water on the floor of the basement.

Johnson, the porter, said that on the morning of July 12th, he came to work at nine o'clock with Tenzer; that he and Tenzer went downstairs and discovered water and that shoes were all over the floor. He tried to remove the water with pails; that he had been bringing the fall stock to the store two or three days prior to the date in question; denied that anyone dipped shoes into water or threw water over the merchandise with a pail but admitted he brought two cases of shoes from the warehouse which he left upstairs, together with some empty cartons.

Moe Tenzer corroborated Johnson's story; denied telling Greenberg to take shoes off shelves and throw water on them; testified he called up insurance brokers telling Strauss of the flood and damage and denied any part in any conspiracy to defraud.

Miss Cullen and her sister testified to conditions which were consistent with innocence of these defendants.

All in all the question was for the jury and we are unable to say that their finding was against the weight of the evidence.

The judgment should be affirmed.