STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. EDWARD A. BURT, DEFENDANT-APPELLANT.

Argued January 26, 1971—Decided July 27, 1971.

*Mr. Arthur Penn,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Mr. Arthur Penn,* of counsel and on the brief).

*Mr. I. Michael Heine,* Assistant Prosecutor, argued the cause for respondent (*Mr. A. Donald Bigley,* Camden County Prosecutor, attorney).

PER CURIAM. The judgment is affirmed for the reasons expressed in the Appellate Division opinion, 107 *N. J. Super.* 390 (1969).

HALL, J. (concurring in part and dissenting in part). Only two points are made by defendant upon our grant of his petition for certification (55 *N. J.* 588 (1970)) following the Appellate Division's affirmance of his conviction for second degree murder and a 25 to 30 year sentence imposed therefor. That tribunal's opinion was published only in part. 107 *N. J. Super.* 390 (1969).

Defendant's first contention is that his right to remain silent in police custody was infringed by two questions asked of him by the prosecutor on cross-examination, after he had testified on direct examination that the fatal shooting of Robert "Shorty" Owens was accidental, and by the prosecutor's later comment thereon in summation. The essence of the question was whether he had ever told the accidental event story to the police, to which he replied in the negative. The Appellate Division's view that the question and comment did not amount to error constitutes the published portion of its opinion. 107 *N. J. Super.* at 392–393. I concur in the result reached on this point.

The second contention is that the sentence is excessive. The Appellate Division rejected that claim in the unpublished portion of its opinion. I disagree with the majority's affirmance of that conclusion.

Some further comments should be made in connection with the first point, since I feel the Appellate Division conclusion may be too broadly expressed. A fuller recital of the state of the proofs at the time the challenged questions were asked is desirable in order to place the issue in full context. These proofs have many bizarre aspects. (They also bear upon my view of the matter of sentence.)

The state sought a first degree murder conviction, with the death penalty, based on a killing in the course of attempted robbery of the victim or on a wilful, deliberate and

premeditated shooting. The whole trial was death penalty oriented. In my view, there was no direct evidence or permissible inference sufficient to take either prong of the theory to the jury. At any rate, the jury, by returning a second degree verdict, did not accept either thesis.[1] At the same time, it also rejected defendant's theory of death resulting from an accidental discharge of the gun in the hands of the victim while defendant was trying to wrestle it from him. There were no eye-witnesses to the event. The state's direct evidence had to rest almost exclusively upon the testimony of a Mrs. Everline Adams, principally concerning what defendant told her immediately after the shooting.

Mrs. Adams (age 61) was a longtime "intimate" friend of the decedent (age 52). She lived in Philadelphia and was in the habit of visiting him periodically at his home in Camden. She testified that on the day in question she arrived at the home about 6:00 P.M. and found him and defendant (age 32) sitting at the dining room table drinking and talking. She had not previously known defendant and was not introduced to him by name.

How defendant came to be there was not explained until he testified. He was a friend of Shorty's of long standing, particularly when both lived in Glassboro. He now lived with his wife and children in Philadelphia and had not seen Shorty for six months. On this day he had taken a bus to Glassboro to see his brother, who was working and not at home. He then stole a car from a parking lot in that town and drove to Gloucester City to his brother's place of employment. Unable to see his brother there, he drove to Camden and visited his union headquarters and the unemployment office, apparently to see about work. (He had been employed for some time at Trio Tire Company, a tire retreading establishment in Clementon, when work was available; at the moment none was and he had a temporary job in Philadel-

---

[1]There was considerable elementary error in the charge bearing upon the first degree and penalty aspects. These errors have become of no moment, however, by reason of the jury's verdict.

phia.) While walking on the street after visiting these offices, he met Shorty, who invited him to his house for a drink. Defendant did not know where Shorty lived. They walked to the house, arrived about 4:00 P.M. and proceeded to talk and drink until Mrs. Adams arrived. Just before she did, defendant said Shorty showed him a revolver, which, with bullets, was in a paper bag. Shorty then put the bag with the gun in his pants pocket. (This was established to be the gun that caused death; the state presented no evidence to account for its origin or presence at the scene or to connect defendant with it prior to the fatal event.)

To return to Mrs. Adams, she testified that after her arrival, drinking, talking and record playing continued for another hour, with everyone in a friendly mood. It seems evident that by that time both men had consumed considerable whiskey and beer. Shorty then stated that he had had enough to drink, had some business to attend to and wanted to go visit some relatives. Mrs. Adams, who was to accompany him, went upstairs to change her shoes. She said that as soon as she reached the bedroom, she heard a scuffle, a groan and a shot from a gun downstairs. A second shot followed and the sound of someone falling to the floor. Defendant immediately came up the stairs with a gun in his hand, said Shorty was dead, that he was going to kill her and "blow your brains out just like I blowed his out." He demanded money and took $5, all she had. He then commanded her to undress and raped her. Thereafter he told her to dress and that he was not going to kill her. She said he required her to accompany him, at gunpoint, out of the house and to the car parked some distance away. He drove her to the bus station to return to Philadelphia. On the way he had her write his telephone number on a card taken from the car's glove compartment (which she later turned over to the police).

Defendant's story of the shooting was quite different. He said that after Mrs. Adams arrived, Shorty became unfriendly and acrimonious conversation developed. While the testi-

mony is not too articulate, the impression is gained that defendant thought Shorty was suggesting he was flirting with Mrs. Adams. His story was that, as soon as Mrs. Adams went upstairs, he told Shorty he was going to leave, that Shorty told him to sit down and that when he looked up, Shorty was pointing the revolver at him. He jumped up, grabbed Shorty's arms and tried to wrestle the gun from him. The gun was discharged once in the struggle (the first bullet apparently entered Shorty's arm) and a second time when Shorty had his left hand with the gun above his head. The second shot caused death; the evidence is clear that it entered Shorty's forehead from above and the expert testimony on both sides is consistent with either a deliberate shot from that angle or an accidental discharge, in the manner defendant asserted. (There was no evidence of robbery or attempted robbery of the victim; his wallet was found on his person with money in it.)

Defendant said that right after the shots he found himself holding the pistol by the barrel, with Shorty slumped on the floor. Mrs. Adams screamed and asked what had happened. He responded that Shorty had tried to kill him and that he was leaving. She asked not to be left alone and he told her to come downstairs. When she did they left the house together and walked to the car. He then drove her to the bus station. It is undisputed that he neither sought aid for the dying man nor did he communicate with anyone about the occurrence. He admitted, in cross-examination questions just before the query challenged here, that he did not know whether Shorty was alive or dead when he left the house.

To complete the summary of the proofs as they stood at the time of the cross-examination involved, reference should be made to further events after the shooting. The state's proofs did not account for defendant's whereabouts after he dropped Mrs. Adams at the bus station until some hours later. A Clementon police officer on patrol noticed a broken window in the Trio Tire establishment (where, it will be

recalled, defendant had been employed). Investigation disclosed defendant asleep on a pile of tires inside. The revolver was found in his pocket. He was charged with breaking and entering and taken to the Camden County jail. (The Clementon police obviously knew nothing about Shorty Owens' death or defendant's connection with it.) Defendant filled in the time interval in his testimony. He said he was very nervous and upset and, after leaving Mrs. Adams at the bus station, bought some more whiskey, drove to the Trio place of business, drank it in the parking lot and fell asleep in the car. When he awoke it was dark and he broke the window to enter and find a place to sleep inside.

The fact of Shorty's death came to light late in the evening when his son went to his house and found his body. The Camden police were called. At that point they knew nothing about defendant. The pieces were finally fitted together during the night. When Mrs. Adams reached her home in Philadelphia, she told her daughter and son-in-law what had happened. The Philadelphia police were advised and, after some delay, the Camden police were notified and Mrs. Adams went back to Camden and told her story, implicating defendant who was then in the jail on the Clementon charge.

With the proofs in this posture, the prosecutor opened his cross-examination of defendant by exploring, as previously indicated, the fact that he did not know whether or not Shorty was dead when he left the house and that he did not make any effort to find out. A few questions later the interchange grounding the issue before us took place:

Q. Did you ever tell this story to the police?
A. No, sir.
Q. You are telling us now this shooting was accidental, is that correct?
A. It was accidental, sir.
Q. But you never told the police that?
A. No, sir.

There was no objection by defense counsel until the next morning when counsel asked for "a curative instruction,"

stating that the jury might well have gained the impression that there was some obligation on defendant "to reveal something to the police," whereas in law "there is no obligation under the Constitution to tell the police anything." The request was refused on the ground that the questions were proper. The judge did say he would in his charge instruct "that the burden is upon the state and no burden exists upon the defendant." (The only instruction given in the charge was the general one that the burden to prove defendant guilty beyond a reasonable doubt rested upon the state throughout.)

The subject was adverted to somewhat differently on two other occasions during the lengthy cross-examination. At one point this took place:

Q. And it didn't occur to you to call anybody or tell anybody about what had happened?

A. No, sir.

And at another, this exchange occurred:

Q. And you didn't tell — up to the time you got to the Camden jail you didn't tell anybody about Shorty, did you?

A. No, sir.

Q. Did you tell anybody about Shorty after you got to the Camden jail?

A. No, sir.

Q. When was the next time you saw Everline?

A. Early that next morning. [At the Camden jail]

Q. And after you saw Everline early the next morning, did you tell anybody about what happened to Shorty?

A. No, sir.

This aspect was referred to twice, quite casually, in the prosecutor's summation. I say casually because the theme of the summation, in support of either prong of the state's first degree murder theory, was that, chiefly because of the theft of the car earlier in the day and his breaking into the tire establishment in the evening, defendant was a bad man

and out to commit criminal acts. At one pont in the summation, this was said:

The charge here is murder, ladies and gentlemen, and the State is asking for the death penalty. This defendant is no innocent little fellow. The defense makes light of what they admit he did, as if this were nothing at all. These admissions play a significant part, as I hope to demonstrate to you later on, ladies and gentlemen, of the pattern that resulted in the murder charge that we are trying here today, and it is not me or the police or Everline Adams who did anything wrong, but if you so find it is the defendant, this is the man who admitted he wasn't sure that Shorty Owens was dead, but he walked out of the house without even attempting to find out whether Shorty Owens was dead or not and before he does go, what does he do? He doesn't go up to the first person he sees or to the police or anybody and say, "I just accidentally shot somebody," which he is trying to tell you he did now. He doesn't do that. He goes down to Clementon and breaks into another place, so let's not get any twisted or warped conception from the defense counsel's argument about just what happened here or where the responsibility lies.

Later on, this observation was made:

He never told the police he accidentally shot Shorty Owens, never, at least up until the time he was lodged in Camden County Jail, and yet he is here, sitting here today asking you to believe this story.

If this was an accidental shooting, why didn't he go and say, "I just accidentally shot somebody"?

He didn't do this, he didn't do this and this fits in, as I said before — I am repeating myself a little bit here — this fits in with our theory that he had something in mind when he took that car off that lot, something in mind of a criminal nature.

It is to be noted that nowhere in the case was any evidence introduced that defendant had been interrogated by the police at any time about Shorty's death or that he had made any inculpatory or exculpatory statements, had stood mute or claimed his privilege against self-incrimination. Even abstractly, therefore, this case is not like *State v. Ripa,* 45 *N. J.* 199 (1965), in which it was held to be reversible error to permit testimony on the state's case, as evidence of guilt, that the defendant had refused to answer police questions about a homicide. Nor is it like *Grunewald v.*

*United States,* 353 *U. S.* 391, 77 *S. Ct.* 963, 1 *L. Ed.* 2d 931 (1957), heavily relied on by defendant, which directed a reversal because the prosecution was permitted to bring out on cross-examination of a defendant that he had claimed the Fifth Amendment privilege and refused to answer questions before a grand jury which, when asked him at the trial on direct examination, produced exculpatory answers and because the prosecution had been permitted to comment thereon in summation by way of attack on the credibility of his trial testimony. Rather, looking solely at the question about defendant's failure to tell the police the accidental event story, in the light most favorable to him, this case seems to fall within the category of decisions dealing with cross-examination questioning and summation comments that relate to a failure to previously volunteer an exculpatory explanation testified to at trial, as a means of challenging the credibility of the testimony. The cases appear to be split in this general type of situation, with no holding by the United States Supreme Court thereon. See, *e. g.,* finding such a course not erroneous, *Sharp v. United States,* 410 *F.* 2d 969 (5th Cir. 1969); *cf. State v. Kimbrough,* 109 *N. J. Super.* 57, 67–68 (App. Div. 1970); *United States v. White,* 377 *F.* 2d 908 (4th Cir.), *cert. den.,* 389 *U. S.* 884, 88 S. Ct. 143, 19 L. Ed. 2d 180 (1967); and finding error, *Fagundes v. United States,* 340 *F.* 2d 673 (1st Cir. 1965); *Fowle v. United States,* 410 *F.* 2d 48 (9th Cir. 1969); *United States v. Brinson,* 411 *F.* 2d 1057 (6th Cir. 1969).

But the issue need not be resolved, since the questions objected to cannot be looked at so abstractly or narrowly. When considered in the context of the quoted related questions and summation comments, it seems that the prosecutor was realistically only trying to bring out the perfectly relevant point that a man would not leave his friend, critically injured by a shot, without seeking assistance for him or at least telling some third party about the situation, if his claim of an accidental event were true. There can be no doubt that the questions would have been proper if they had been

limited to asking whether defendant ever told anyone about an accidental shooting before his trial testimony, or why he did not call an ambulance or the police at once. In effect, this was the point that the prosecutor was trying to make, and the reference to not telling the police has to be considered in that light.[2] I fail to see how that reference can be said, under the circumstances, to constitute any infringement upon the Fifth Amendment right to remain silent.

Moreover, all of this questioning and comment was quite incidental and represented only a minute fraction of the testimonial evidence and summation argument. As earlier pointed out, the prosecutor's thesis of guilt that he stressed to the jury rested upon quite a different hypothesis.

Finally, the rationale of the latest decision of the United States Supreme Court in an analogous situation, handed down since the oral argument of this case, may well be said to indicate that that court would find the particular questions here objected to entirely permissible in their context. I refer to *Harris v. New York*, 401 *U. S.* 222, 91 S. Ct. 643, 28 *L. Ed.* 2d 1 (1971). There it was held by a divided court that inculpatory statements taken from a defendant in violation of *Miranda v. Arizona*, 384 *U. S.* 436, 86 S. Ct. 1602, 16 *L. Ed.* 2d 694 (1966), which were inconsistent with his trial testimony, could be used to impeach his credibility. Chief Justice Burger epitomized the holding in saying: "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (401 U. S. at 226, 91 S. Ct. at 646, 28 *L. Ed.* 2d at 5).

This brings me to the matter of the question of the sentence. The jury, in my opinion, most properly rejected the first degree murder theories. Upon the evidence, as sparse

---

[2]Such questioning attacking credibility should avoid any claim of error by dealing with the matter generally, without referring to a failure to tell police. If the latter creeps in, an immediate cautionary instruction to the jury, placing the questioning in proper perspective, is quite advisable.

and doubtful as it is in many respects, it was their peculiar province to decide between second degree murder and acquittal on the basis of an accidental event. At worst this tragic occurrence represented a silly quarrel or misunderstanding between friends kindled by too much drink to the point of violence and subsequent irresponsible behavior. The defendant had no criminal record, was a good family man and, according to substantial character witnesses, bore a good reputation in his stratum of society. The presentence report was generally favorable to him and recommended leniency. The trial judge in sentencing, however, looked upon the affair as a deliberate shooting, of which, as I have said, I find no sufficient evidence, and imposed the maximum sentence for murder in the second degree on that thesis. Under all the circumstances, this to me amounts to an abuse of discretion. I would reduce the minimum and maximum terms by 10 years.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR and SCHETTINO—5.

*For modification*—Justice HALL—1.