840 A.2d 928 (2004)
366 N.J. Super. 185
STATE of New Jersey, Plaintiff-Respondent,
v.
Naseem Abdul MUHAMMED, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted January 5, 2004.
Decided January 30, 2004.
*930 Yvonne Smith Segars, Public Defender, attorney for appellant (Gregory R. Mueller, Designated Counsel, and on the brief).
James F. Avigliano, Passaic County Prosecutor, attorney for respondent (Terry Bogorad, Senior Assistant Prosecutor, of counsel, and on the brief).
Before Judges HAVEY, FALL and PARRILLO.
*929 The opinion of the court was delivered by PARRILLO, J.A.D.
Defendant Naseem Abdul Muhammed was charged in a Passaic County indictment with first-degree kidnapping, N.J.S.A. 2C:13-1(b)(1) (count 1); first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(6) (count 2); and third-degree *931 aggravated sexual contact, N.J.S.A. 2C:14-3(a) (count 3). Tried to a jury, defendant was acquitted of all three charges but found guilty of the lesser-included offense of fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b). The jury deadlocked on the lesser-included charge of second-degree kidnapping, N.J.S.A. 2C:13-1(c), which was ultimately dismissed by the trial judge. On the criminal sexual contact conviction, defendant was sentenced to an eighteen-month term. Appropriate fees and penalties were also imposed.
There were differing versions of the encounter between defendant and M.M. from which the criminal charges against defendant arose. According to the State's proofs, on December 22, 1999, at approximately 11:30 p.m., M.M. was walking near the corner of Ellison Place and East 22nd Street in Paterson, an area known for being frequented by prostitutes. M.M. was walking home from a cousin's house when she noticed a vehicle slowly approaching from behind. The vehicle pulled in front of M.M. and defendant exited. He showed M.M. a badge and identification card, claimed to be a Paterson police officer, and informed her that she was under arrest for prostitution. Actually, defendant had been a police officer for the City of Passaic for about fifteen years but was terminated from service one month prior to this incident and at the time was challenging his termination. In any event, M.M. denied being a prostitute and explained that she was just walking to her home a few blocks away. Nevertheless, M.M. complied with defendant's command to get into the back seat of his unmarked Nissan Maxima because she was "taught to trust the police" and believed that she had no other choice.
Defendant, who was drinking beer, drove to a secluded, dead-end street in the area of East 25th Street and 17th Avenue in Paterson, where he parked. Defendant asked M.M. if she had a condom and told her that if she would "do [him] right" he would let her go. Defendant then climbed into the back seat, put on a condom, and forced M.M. to perform fellatio on him. Five minutes later, defendant told M.M. to remove her clothes. When she refused, he pulled them off of her himself, turned her over onto her stomach and had vaginal sex with her for approximately fifteen to twenty minutes.
When he was finished, defendant took the condom off and wrapped it in a napkin and threw it on the floor. He then dressed and returned to the front seat of the car, while M.M. picked up the condom and placed it in her pocket. M.M. refused the $4 defendant offered to pay her, and declined to move into the front seat as defendant requested because she was afraid that he would drive away and leave her "standing there looking stupid."
Rather than get out of the car and run away, M.M. instead insisted that defendant drive her to the Paterson police station as he had originally threatened. Even when defendant told her she could get out, M.M. refused to leave and again insisted that defendant take her to the police station. Defendant drove away and while he and M.M. traveled through Paterson, he repeatedly pulled to the side of the road and asked M.M. to move up to the car's front seat, but each time she declined. Finally, at approximately 1:15 a.m. they arrived at the Paterson police headquarters.
Defendant identified himself to the officer at the desk, Sergeant Alexander DeLuccia, as a Passaic police officer and displayed a badge that DeLuccia recognized as similar to those carried by Passaic police officers. Defendant began to speak to Sergeant DeLuccia when M.M. interrupted and said that defendant had forced her to have sex with him. Defendant then explained *932 that he had ordered M.M. into his car in order to confront her about her harassment of his brother and sister and to convince her to stop. After hearing defendant's version, Sergeant DeLuccia asked M.M. for her account and she repeated that defendant had ordered her into his car after identifying himself as a police officer, took her to a secluded location, and forced her to have sex with him. Following the assault, she refused to exit the vehicle and insisted that defendant take her to the police station. M.M. then produced a paper towel containing the condom that she claimed defendant had worn during the sexual assault.
According to Sergeant DeLuccia, defendant became nervous and upset at that point and stated that he wanted to go home, that he was married and lived in Passaic with his wife. Sergeant DeLuccia responded that defendant was not free to leave and that the incident had to be investigated, at which time another Paterson police officer moved into position near defendant. Defendant and M.M. were then separated. Defendant was read the Miranda[1] warnings, and was subsequently arrested.
Despite his initial account of the incident to the police, defendant did not testify at trial but suggested, through counsel, that M.M. was a prostitute and that any sexual relations between the two were consensual. As noted, the jury acquitted defendant of all charges in the indictment but convicted him of the lesser-included offense of criminal sexual contact.
On appeal, defendant raises the following issues for our consideration:
I. THE PROSECUTOR'S REPEATED COMMENTS ON SILENCE WERE INAPPROPRIATE AND INFRINGED ON DEFENDANT'S RIGHT AGAINST SELF-INCRIMINATION UNDER THE FIFTH AMENDMENT AND STATE LAW.
II. DEFENDANT'S CONVICTION SHOULD BE REVERSED BECAUSE THE COURT ADMITTED NUMEROUS STATEMENTS FROM THE DEFENDANT WITHOUT CONDUCTING A RULE 104 HEARING, AND FAILED TO PROVIDE REQUIRED INSTRUCTIONS TO THE JURY.
III. DEFENDANT'S CONVICTION FOR FOURTH DEGREE CRIMINAL SEXUAL CONTACT SHOULD BE REVERSED BECAUSE THAT CHARGE SHOULD NOT HAVE BEEN SUBMITTED TO THE JURY AS A LESSER INCLUDED OFFENSE UNDER THE FACTS OF THIS CASE.
IV. THE SENTENCE IMPOSED WAS EXCESSIVE AND THE SENTENCING JUDGE USED IMPROPER FACTORS TO OVERCOME THE PRESUMPTION AGAINST IMPRISONMENT.
V. DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.
We conclude that the issues raised in Points I and III are meritorious and warrant reversal of defendant's conviction.

I
Defendant's principal contention is that the prosecutor's repeated references over defense objections to defendant's failure to offer the version of events *933 suggested at trialnamely that M.M. was a prostitute with whom he engaged in consensual sexat the time of his original account to the police and while in custody infringed on his Fifth Amendment right against self-incrimination and New Jersey's common law and statutory counterpart of that privilege. We agree and also find, as a matter of basic evidence law, that such comments were not relevant and unduly prejudicial.
The prosecutor's comments on opening, on examination of Sergeant DeLuccia, and on summation, which were the subject of defense objection below and are now challenged on this appeal, are as follows. In his opening statement, the prosecutor stated:
When [defendant is at the police department] he explains how it is that he and [M.M.] came together that night and he doesn't say that she was a prostitute ...
Later, in his opening, the prosecutor reiterated the point about defendant's omission:
He did not say he picked her up to have sex with her. He did not say she was a prostitute.
Defense counsel objected to these comments and moved for a mistrial, but the trial judge denied the motion as well as the request for a curative instruction.
In his case-in-chief, during the direct examination of Sergeant DeLuccia, the prosecutor continued this theme in the following exchange:
Q. In addition to telling you that he picked up [M.M.] in order to scare her because she had been bothering his brother and sister, did [defendant] say anything to you about having sex with [M.M.]?
A. No. Nothing.
Q. Did the subject of her being a prostitute ever come up?
A. No, sir.
Later, the prosecutor asked Sergeant DeLuccia:
Q. All right. From the moment that you first saw [defendant] [] to the time you went off duty that morning, did the subject ever come up concerning prostitution?
Although the trial judge sustained defense objection on the ground that the question was overbroad, he permitted the following colloquy to take place:
Q. Sergeant, from the moment that you first laid eyes on [defendant and M.M.], from the time that you saw them come in that clear door, to the time that [M.M.] was taken to the front of the police department and [defendant] was escorted to another room and you lost sight of the two, from point A to point B as I've just outlined it, did [defendant] ever say anything with regard to prostitution or allege that [M.M.] was a prostitute?
A. No, sir.
Q. Did the subject of prostitution ever come up during that period of time?
A. No, sir.
In direct examination of another witness, Officer Louis DeLucca, the prosecutor asked:
Q. Now, at some point after you, in the company of the Captain, meet with [defendant], after you get his name, after he produces a police badgePassaic police badge, after he produces the Passaic housing officer ID card, and after he identifies himself as a Passaic police officer, he was actually formally placed under arrest, correct?
A. Correct.
Q. Before that happened, from the time you first met him to the time that he was placed under arrest, did the subject of prostitution ever come up between *934 you, the Captain or the Defendant?
A. No.
During his summation, the prosecutor made further references to defendant's omission, stating:
[M]inutes after this incident occurs, [defendant] goes into the Paterson Police Department with [M.M.] and stakes out his position. In effect he says[,] here I stand, this is my position, and he never said, in staking out his position, that [M.M.] was a prostitute.
Later in closing, the prosecutor highlighted the same notion:
[Defendant] said he found [M.M.] around 27th Street, and he said not that he picked her up as a prostitute, not that he had sex with her. He didn't say that....
Not so that he could have sex with her, not so that he could hire her as a prostitute, but that so he could scare her so she wouldn't bother his brother or sister on 27th Street....
He didn't say that she was a prostitute. He didn't say he hired a prostitute. He didn't say he had sex with her during an act of, an act of prostitution. He didn't say any of that.
And still later, as if the jury needed reminding, the prosecutor once again emphasized defendant's failure to disclose:
And don't you think that if [defendant] were engaged in prostitution, that would be the time to say it? But he didn't. You know why? Because he wasn't....
Defendant's counsel objected to the prosecutor's closing and again moved for a mistrial, which was denied by the trial judge who also failed to provide either a curative or a limiting instruction.
At issue is not the volunteered statement defendant initially made to police as to why he picked up M.M., but rather the State's repeated references to the omission from that exculpatory account, both before and after M.M.'s accusation of sexual assault, of the version suggested at trial that M.M. was a prostitute soliciting sex. Defendant contends such comments and questions were designed to improperly draw meaning from silence rather than elicit an inconsistency. Defendant further complains that these comments were made as part of the State's case-in-chief even though ostensibly offered only for the limited purpose of impeaching the credibility of a defendant who elected not to testify, State v. Marshall, 260 N.J.Super. 591, 597, 617 A.2d 302 (App.Div.1992), and not as substantive proof of guilt, for which they lacked any real relevance in any event. Finally, defendant argues that the challenged remarks relate to the entire police encounter, both pre-arrest, and custodial when it was clear defendant was not free to leave after M.M. presented physical corroboration of her rape accusation, and as such constitute impermissible comment on his post-arrest silence. The State counters that it did not comment on defendant's silence but rather, just the opposite, on his prior statement to the police to demonstrate its inconsistency with the version intimated by the defense at trial.
In New Jersey, although the privilege against self-incrimination is not part of our Constitution, it is enshrined in the common law, and codified in statute and as part of our evidence rules. See N.J.S.A. 2A:84A-19 and N.J.R.E. 503. See also State v. Dreher, 302 N.J.Super. 408, 474, 695 A.2d 672 (App.Div.1997). In fact, New Jersey's privilege against self-incrimination is generally regarded as offering broader protection than its federal constitutional counterpart. See State v. Strong, 110 N.J. 583, 595, 542 A.2d 866 (1988).
*935 The right of an accused or a suspect to remain silent when in police custody or under interrogation has always been a fundamental aspect of the privilege in this State. State v. Deatore, 70 N.J. 100, 114, 358 A.2d 163 (1976). As such, the State may not use a defendant's post-arrest silence to establish guilt. Id. at 108-09, 358 A.2d 163; State v. Lyle, 73 N.J. 403, 410, 375 A.2d 629 (1977); State v. Ruscingno, 217 N.J.Super. 467, 470, 526 A.2d 251 (App.Div.1987). See also Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
In Deatore, supra, our Supreme Court held that a defendant who remains silent, or who fails to volunteer exculpatory information "at or near" the time of his arrest, may not be cross-examined regarding such silence in order to impeach his credibility and to permit an inference that his exculpatory testimony at trial is untrue. 70 N.J. at 108-09, 113, 358 A.2d 163. In Deatore, the defendant was on trial for armed robbery. Id. at 103, 358 A.2d 163. Testifying on his own behalf, he stated that he was elsewhere at the time of the crime. Id. at 104, 358 A.2d 163. On cross-examination, the defendant was asked whether he had disclosed his alibi to the police at the time of his arrest. Ibid. He responded that he recalled only that he had asked for a receipt for money taken from him by the police. Ibid. When asked if it was not true that he had refused to make any statement, the defendant replied, "Nobody asked me." Id. at 107, 358 A.2d 163. The Appellate Division reversed the defendant's conviction on the ground that the State's cross-examination had penalized the defendant's exercise of his privilege against self-incrimination. Id. at 109, 358 A.2d 163. Affirming, our Supreme Court observed that:
The practical effect of the privilege to remain silent is, as we held a decade ago, that when a defendant expressly refused to answer, no inference can be drawn against him under the doctrine of acquiescence by silence or any other concept[] and no comment thereon may be made to the jury.... This being so, it should certainly follow that a defendant is under no obligation to volunteer to the authorities at the first opportunity the exculpatory story he later tells at his trial and cannot be penalized directly or indirectly if he does not.
[Id. at 70 N.J. at 115, 358 A.2d 163 (citations omitted).]
If, under Deatore and its progeny[2], silence cannot be used to impeach the credibility of a defendant who testifies on his own behalf, a fortiori it may not be used for impeachment purposes, much less to prove consciousness of guilt, where, as here, defendant elects not to testify and is therefore unavailable to explain his silence. See State v. Holmes, 290 N.J.Super. 302, 316, 675 A.2d 1125 (App.Div.1996); State v. Marshall, supra, 260 N.J.Super. at 597, 617 A.2d 302.
Deatore involved silence "at or near" a defendant's arrest, and did not deal with silence significantly preceding an arrest, where no governmental compulsion exists. 70 N.J. at 108, 358 A.2d 163. As to the latter, our Supreme Court years later held that pre-arrest silence is admissible to impeach a defendant's credibility but only if such silence has sufficient probative value. State v. Brown, 118 N.J. 595, 613, 573 A.2d 886 (1990). The Brown Court reasoned that since defendant neither has "a right not to speak prior to arrest," nor "a duty to speak prior to arrest," id. at 613, 573 A.2d 886, then *936 "evidence of pre-arrest silence, particularly in the absence of official interrogation, does not violate any right of the defendant involving self-incrimination." Ibid. Nevertheless to be admissible, evidence of prearrest silence must be probative on the issue of credibility or culpability. Id. at 612, 573 A.2d 886. And pre-arrest silence has sufficient probative value for purposes of impeachment only if "when viewed objectively and neutrally in light of all circumstances, it generates an inference of consciousness of guilt that bears on the credibility of the defendant when measured against the defendant's apparent exculpatory testimony." Id. at 615, 573 A.2d 886. In other words, "[i]f it can be inferred by the fact-finder that a reasonable person situated as the defendant, prior to arrest, would naturally have come forward and mentioned his or her involvement in the criminal episode, particularly when this is assessed against the defendant's apparent exculpatory testimony, then the failure to have done so has sufficient probative worth bearing on defendant's credibility for purposes of impeachment." Id. at 613-14, 573 A.2d 886.
Both Brown and Deatore dealt with a defendant's silence, pre-arrest and post-arrest, respectively. In contradistinction, the privilege's strictures against the use of custodial silence, and even the evidential restrictions on pre-arrest silence, have no application to statements or conduct of a defendant inconsistent with his or her exculpatory trial testimony. Thus, where a defendant makes a statement at or near arrest which is inconsistent with his trial testimony, State v. Kimbrough, 109 N.J.Super. 57, 65-68, 262 A.2d 232 (App.Div.1970), or where his conduct at the time of the crime or thereafter is at odds with the story told at trial, State v. Burt, 59 N.J. 156, 279 A.2d 850 (1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972), none of the Fifth Amendment or evidential concerns attendant upon silence are implicated. As to the former, it is proper to use prior inconsistent utterances to impeach a defendant's trial testimony even though the utterances were made before the defendant was adequately apprised of his rights and therefore would have been inadmissible on the prosecution's case-in-chief by reason of that Miranda violation. Harris v. New York, 401 U.S. 222, 226, 91 S.Ct. 643, 646, 28 L.Ed.2d 1, 15 (1971). See also Oregon v. Hass, 420 U.S. 714, 723, 95 S.Ct. 1215, 1223, 43 L. E.2d 570, 578 (1975); Kimbrough, supra, 109 N.J.Super. at 65-68, 262 A.2d 232. In other words, statements, as opposed to silence, of a defendant in violation of Miranda are admissible for the limited purpose of impeachment where defendant chooses to testify at trial.
By the same token, conduct that is intrinsically indicative of a consciousness of guilt, such as unexplained flight, may be properly probed by the State on impeaching cross-examination of the defendant. Burt, supra, 59 N.J. at 156, 279 A.2d 850. See also State v. Phillips, 166 N.J.Super. 153, 160, 399 A.2d 315 (App. Div.1979), certif. denied, 85 N.J. 193, 426 A.2d 38 (1981). The charge in Burt was murderthe shooting of a friend. The defense at trial was that the shooting was accidental. The proofs up to the point of the cross-examination in question established that defendant had not sought medical or other assistance for his injured friend after the incident, had left the locale without knowing whether he was dead or alive, and had not reported the occurrence to the police when he was arrested for another offense a few hours later (the police at that time did not know of the shooting), nor indeed to anyone. The purpose of the cross-examination was, in essence, to bring all this out and thus convince *937 the jury that the trial testimony of accidental shooting could not be true. This was found to be proper, 59 N.J. at 156, 279 A.2d 850, because, as the Court in Deatore later said of the Burt decision, "[i]t was in fact not a true case of silence in police custody as to an exculpatory story, but rather one of conduct, albeit nonaction, after the charged crime inconsistent with defendant's [testimony] at trial." 70 N.J. at 118, 358 A.2d 163.
Following suit, the State here argues that this is a case of a prior inconsistent statement rather than mere silence in police custody. The State thus posits that its purpose was simply to bring to the jury's attention that while defendant volunteered an exculpatory story to the police, he had not included in that account what his defense implied at trial, namely that M.M. was a prostitute soliciting sex at the time of the incident. Its reasoning, of course, is that an innocent man would not have withheld such an exculpatory story prior to trial but would have asserted it to avoid charges and that therefore the natural inference follows that the trial version is untrue. Thus, the State concludes the material omission from the prior statement of any claim that the victim was a prostitute was the proper subject of prosecutorial comment. We disagree. The State's position overlooks several critical distinctions between the present situation and those cases finding appropriate cross-examination or rebuttal testimony concerning prior statements or conduct of a defendant inconsistent with the exculpatory story told at trial.
In the first place, unlike the latter line of cases where prior statements or actions were used to impeach the accused's trial testimony, defendant here elected not to testify and therefore the challenged comments and questions could not have been made for the purpose of impeachment. See State v. Holmes, supra, 290 N.J.Super. at 316, 675 A.2d 1125; State v. Marshall, supra, 260 N.J.Super. at 597, 617 A.2d 302. Nor do we discern any basis for their use, on this record, as substantive evidence of guilt, even if generally allowable. See Dreher, supra, 302 N.J.Super. at 465-66, 695 A.2d 672.
Just as significant, the prosecutorial references in this case were, as a practical matter, to defendant's post-arrest silence, or at the very least to silence "at or near" the time of arrest, State v. Deatore, supra, 70 N.J. at 108-09, 358 A.2d 163, a subject clearly protected by New Jersey's privilege and plainly beyond any proper prosecutorial commentary. Although defendant did volunteer a partial statement to the police in explanation for his presence at headquarters, by the time he was confronted with corroborative proof of the rape accusation, and the situation had become custodial, he had by necessity abandoned his original account of the incident and expressly declined to speak any further, other than of course to indicate a strong desire to leave and return to his family. Faced with demonstrative evidence that he had sex with the complainant, and further with physical constraints on his freedom of movement, defendant obviously could no longer adhere to his initial story and thus exercised his right to remain silent. Given the shift in defendant's position, the prosecutor's comments could be interpreted in no other way than as a direct reference to defendant's custodial silence rather than to his earlier disclosure. In other words, the State's repeated references to defendant's failure to disclose his allegation that M.M. was a prostitute were not designed to elicit an explanation for his prior statement, which was admissible and already before the jury for its consideration, but rather to highlight, impermissibly, defendant's silence in the wake of accusation and official *938 interrogation. Such use of custodial silence is clearly prohibited.
We see no reason under the circumstances of this case to place any greater significance on the fact that defendant spoke immediately prior to his arrest. That fact alone does not open the door to prosecutorial comment on exculpatory facts not then disclosed or omitted from the earlier statement. Compare Doyle v. Ohio, supra, 426 U.S. at 622-23, n. 4, 96 S.Ct. at 2247, n. 4, 49 L. Ed.2d at 101, n. 4; State v. Deatore, supra, 70 N.J. at 108, 358 A.2d 163; and State v. Lyle, supra, 73 N.J. at 409, 375 A.2d 629, with Anderson v. Charles, 447 U.S. 404, 409, 100 S.Ct. 2180, 2182, 65 L. Ed.2d 222, 227 (1980); and State v. Marks, 201 N.J.Super. 514, 531-33, 493 A.2d 596 (App.Div.1985), certif. denied, 102 N.J. 393, 508 A.2d 253 (1986). Indeed, the defendants in Doyle v. Ohio, supra, State v. Deatore, supra, and State v. Lyle, supra, did not remain entirely silent upon their arrests yet the United States Supreme Court in Doyle and our Supreme Court in Deatore and Lyle analyzed the due process question as if those defendants remained silent and framed the issue in terms of whether such post-arrest silence could be used to attack the credibility of a defendant who subsequently provided exculpatory facts at trial. The rulings in those cases, which consistently answered the question so framed in the negative, apply with equal force to the facts in this case. Simply put, defendant here chose to remain silent in the face of accusation, and the prosecutor's questions and opening and closing statements highlighting that fact impermissibly penalized defendant for legitimately exercising his constitutional and common law right.
Even if, as the State argues, the challenged remarks may be considered to relate only to defendant's pre-arrest silence or omission, that is to a time before he became a suspect, they nevertheless lack any evidential basis and, as such, constitute prejudicial error. N.J.R.E. 401; N.J.R.E. 403. As noted, for pre-arrest silence to be admissible to impeach a defendant's credibility, it has to have sufficient probative value. Brown, supra, 118 N.J. at 612, 573 A.2d 886. For silence to be probative, "it must appear that the failure to speak was unnatural and that an ordinary person would have come forward with the exculpatory information under the circumstances." State v. Merola, 214 N.J.Super. 108, 118, 518 A.2d 518 (App. Div.1986), certif. denied, 107 N.J. 91, 526 A.2d 168 (1987). Here, the defendant's failure to disclose the prostitution allegation at the earliest possible point has no real probative value on, or relevance to, the issue of his credibility or culpability. Rather, it is likely defendant omitted this detail from his original version because of the incriminatory potential of such an admission, and its damaging effect on his efforts to seek reinstatement as a police officer. Indeed, admitting having engaged in prostitution would have exposed defendant to criminal charges and ended any possibility of reentering the law enforcement field.
In State v. Merola, supra, the State alleged that the defendant had killed one person and wounded another during a drug deal; the defendant claimed that the two victims had shot each other during the drug deal. 214 N.J.Super. at 111-14, 518 A.2d 518. The defendant did not surrender to the police until he read about the incident in a local paper. Ibid. At trial, the prosecutor questioned the defendant about his failure to have communicated with the police immediately. Ibid. On appeal, defendant argued that this questioning violated his privilege against self-incrimination. Ibid. In explaining why the defendant's pre-arrest silence was not probative, *939 the court considered whether silence was natural or unnatural under the circumstances. Id. at 118-120, 518 A.2d 518. It found that, among other likely explanations for his silence, that admitting he had attempted to purchase cocaine during the criminal incident would have resulted in separate criminal charges against him as well as violation of his probation. Id. at 118, 518 A.2d 518. Thus, the court held that prior to arrest, a defendant is under no obligation to volunteer information which, although exculpatory as to the crime charged, would incriminate him as to another offense. Ibid. Therefore, the court held, the State should not have been permitted to attack a defendant's credibility on the basis of his pre-arrest failure to provide such information. Id. at 120, 518 A.2d 518.
Similarly, in Commonwealth v. Nickerson, 386 Mass. 54, 434 N.E.2d 992 (1982), the Court held that impeachment by silence was improper where the defendant would have subjected himself to criminal charges had he come forward and apprised the authorities of the exculpatory story he ultimately gave in his trial testimony. Id. at 997. The Court stated that "impeachment of a defendant with the fact of his pre-arrest silence should be approached with caution, and, wherever it is undertaken, it should be prefaced by a proper demonstration that it was `natural' to expect the defendant to speak in the circumstances." Ibid. See also Holmes, supra, 290 N.J.Super. at 316-17, 675 A.2d 1125 (holding that because defendant's parole might have been revoked if he reported that in self-defense he had killed a person with whom he was involved in drug dealings, his pre-arrest silence was probably not admissible to attack his credibility).
So too here. Defendant's silence was at the very least equivocal and ambiguous. Clearly, it would not have been natural for defendant to have come forward in the circumstances of this case and produce incriminating evidence against himself. Even assuming that the State's use of this omission does not violate due process standards under Deatore because it is not considered to have occurred "at or near" the time of defendant's arrest, we nevertheless conclude that defendant's failure to volunteer incriminating information at the earliest possible time says too little about the credibility of his defense at trial and even less about his culpability.
Thus, while we hold that New Jersey's common law privilege protects defendant's post-arrest silence against any adverse comment by the State, to the extent the prosecutor's comments may be interpreted to refer to an earlier point in time, we rest our decision upon the simple evidentiary principle that pre-arrest silence under the facts of this case lacked relevance and had little, if any, probative force. N.J.R.E. 401. Given the clear capacity for prejudice, we therefore conclude that the trial judge committed reversible error in permitting the prosecutor to repeatedly comment on defendant's failure to disclose the version of events suggested for the first time at trial.

II
We now address defendant's other principal claim that it was plain error to charge the jury with the lesser-included offense of criminal sexual contact. Again, we agree.
Defendant was charged in count two of the indictment with committing the firstdegree crime of aggravated sexual assault by sexually penetrating M.M. by force or coercion, resulting in severe personal injury to her, N.J.S.A. 2C:14-2(a)(6), and in count three with second-degree aggravated criminal sexual contact by committing an act of sexual contact upon M.M. by force *940 or coercion, resulting in severe personal injury to her, N.J.S.A. 2C:14-3(a). The State's proofs at trial were that defendant lured the victim into his car under false pretenses and then forced her to perform fellatio on him before he forcibly raped her. At the close of evidence, the defense objected to proposed jury instructions on the lesser-included offenses of lewdness, simple assault, and criminal restraint, but apparently did not challenge the court's charge on the lesser-included offense of fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b).
The jury deliberated for three days during which they advised the trial judge on four separate occasions that they were deadlocked. Ultimately, they arrived at a verdict acquitting defendant of first-degree kidnapping and of the more serious sexual offense charges, and convicting him of count three's lesser-included offense of criminal sexual contact.
While a defendant "is entitled to a charge on all lesser-included offenses supported by the evidence," State v. Short, 131 N.J. 47, 53, 618 A.2d 316 (1993); State v. Purnell, 126 N.J. 518, 531, 601 A.2d 175 (1992) (stating that "a trial court must charge the jury regarding `all of the possible offenses that might reasonably be found from such facts.' ") (quoting State v. Ramseur, 106 N.J. 123, 271 n. 62, 524 A.2d 188 (1987)), a court "shall not charge the jury with respect to an included offense unless there is a rational basis" for doing so. N.J.S.A. 2C:1-8(e). In other words, to justify a lesser-included offense instruction, a rational basis must exist in the evidence for a jury to acquit the defendant of the greater offense as well as to convict the defendant of the lesser, unindicted offense. State v. Brent, 137 N.J. 107, 113-14, 644 A.2d 583 (1994). See also State v. Crisantos, 102 N.J. 265, 278, 508 A.2d 167 (1986).
In assessing whether to charge the jury on a lesser-included offense, our courts employ a different standard based on whether or not a charge was requested by a defendant at trial. Brent, supra, 137 N.J. at 115, 644 A.2d 583. An unrequested charge on a lesser-included offense must be given only where the facts in evidence "clearly indicate" the appropriateness of that charge. State v. Choice, 98 N.J. 295, 298, 486 A.2d 833 (1985) (citing State v. Powell, 84 N.J. 305, 319, 419 A.2d 406 (1980); State v. Grunow, 102 N.J. 133, 148-49, 506 A.2d 708 (1986) (noting that "a court ordinarily has supervening responsibility to charge the jury concerning any version of the offense `clearly indicate[d]' by the evidence to require proper jury consideration")); see also State v. Singleton, 290 N.J.Super. 336, 341-42, 675 A.2d 1143 (App.Div.1996). Accordingly, a trial court "should not `scour the statutes to determine if there are some uncharged offenses of which the defendant may be guilty.' " Brent, supra, 137 N.J. at 118, 644 A.2d 583 (quoting State v. Sloane, 111 N.J. 293, 302, 544 A.2d 826 (1988)); see also Choice, supra, 98 N.J. at 299, 486 A.2d 833 (stating that trial court does not "have the obligation on its own to meticulously sift through the entire record" to find appropriate charges).
By contrast, when a defendant requests a lesser-included offense to be charged, the Court has recognized that a strict adherence to the definition of "included" under N.J.S.A. 2C:1-8d "is less important than whether the evidence presents a rational basis on which the jury could acquit the defendant of the greater charge and convict the defendant of the lesser." Brent, supra, 137 N.J. at 117, 644 A.2d 583; See also Purnell, supra, 126 N.J. at 531, 601 A.2d 175 (citing Sloane, supra, 111 N.J. at 300, 544 A.2d 826 ("the statutory definition of lesser-included offenses *941 ... is not `all-encompassing,' nor are the statutory categories `water-tight compartments.' ")).
A defendant would be guilty of aggravated sexual assault, a first-degree crime, if he committed
an act of sexual penetration with another person under any one of the following circumstances:
(6) [t]he actor uses physical force or coercion and severe personal injury is sustained by the victim.
[N.J.S.A. 2C:14-2(a)(6).]
"Sexual penetration" is defined as "vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger, or object into the anus or vagina either by the actor or upon the actor's instruction." N.J.S.A. 2C:14-1(c).
In contrast, in order to commit criminal sexual contact under N.J.S.A. 2C:14-3(b), "a defendant must commit an act of " `sexual contact' with the victim under any of the circumstances set forth in section 2C:14-2(c)(1) through (4)," including through the use of physical force or coercion, during or after which the victim does not sustain severe personal injury. See N.J.S.A. 2C:14-2(c)(1). "Sexual contact" is defined as "an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor...." N.J.S.A. 2C:14-1(d).
Here, while fourth-degree criminal sexual contact is squarely included in the offense of aggravated criminal sexual contact charged in count three of the indictment, see N.J.S.A. 2C:1-8(d), neither crime is rationally based in, much less clearly indicated by, the evidence adduced at trial. The proofs demonstrated forced sexual penetration both vaginally and orally and nowhere did the evidence suggest, or the State theorize, mere intentional touching. Thus, there was no rational basis for a conviction of sexual contact.
In State v. Cuni, 303 N.J.Super. 584, 697 A.2d 550 (App.Div.), certif. denied, 152 N.J. 12, 702 A.2d 351 (1997), both the defendant and the mentally handicapped victim testified that vaginal intercourse had occurred. Id. at 592, 697 A.2d 550. The prosecutor requested the trial judge to charge the jury on the lesser-included offense of sexual contact, but the judge denied the State's application. Id. at 610, 697 A.2d 550. In affirming the trial court, we said:
[T]he judge properly denied the prosecution's request to charge the jury as to the crime of sexual contact, a crime not involving vaginal intercourse but rather an intentional touching of the victim's intimate parts. See N.J.S.A. 2C:14-1(d). The judge is required to charge the jury on a lesser-included offense only if there is "a rational basis for a verdict convicting the defendant of the included offense." N.J.S.A. 2C:1-8(e); see also State v. Moore, 113 N.J. 239, 289, 550 A. 2d 117 (1988). Here, there was no rational basis for a conviction of sexual contact.
[Id. at 610, 697 A.2d 550.]
Here, as in Cuni, no evidence of mere sexual contact was presented and therefore it was error to have charged the jury on an offense not rationally based on the evidence. On this score, our Supreme Court has acknowledged that "the jury must convict of a crime supported by the evidence, as opposed to compromising between jurors who want the greater charge and jurors who want to acquit." State v. Cooper, 151 N.J. 326, 366, 700 A.2d 306 (1997). Moreover, "it is the duty of the jury not to reach compromise verdicts based on sympathy for the defendant or to *942 appease holdouts, but to render a just verdict by applying the fact it finds to the law it is charged." State v. Harris, 141 N.J. 525, 553, 662 A.2d 333 (1995) (citation omitted). Given the circumstances surrounding return of the verdict, we are convinced that the very harm addressed by these cases was realized here. Because the trial court's decision to charge the jury on a lesser-included offense not rationally based on the evidence was plain error, we reverse and vacate defendant's conviction.

III
In light of this disposition, we need not address the remaining issues raised by defendant. However, we note only with respect to the issue raised in defendant's Point II that the trial court's failure to instruct the jury in accordance with State v. Hampton, 61 N.J. 250, 294 A.2d 23 (1972) and State v. Kociolek, 23 N.J. 400, 129 A.2d 417 (1957) was not error since defendant's oral statements to the police, the precise contents of which are not in dispute, were neither inculpatory nor the result of custodial police interrogation. See State v. Harris, 156 N.J. 122, 183, 716 A.2d 458 (1998); State v. Baldwin, 296 N.J.Super. 391, 398-402, 686 A.2d 1260 (App.Div.), certif. denied, 149 N.J. 143, 693 A.2d 112 (1997).
The judgment of conviction is reversed and vacated.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966).
[2] See, e.g., State v. Whitehead, 80 N.J. 343, 346-348, 403 A.2d 884 (1979); State v. Lyle, supra, 73 N.J. at 409, 375 A.2d 629; State v. Alston, 70 N.J. 95, 98, 358 A.2d 161 (1976).