868 A.2d 302

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. NASEEM ABDUL MUHAMMAD, DEFENDANT–RESPONDENT.

Argued October 12, 2004—Decided March 15, 2005.

554

556 

*Leslie–Ann M. Justus,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General of New

Jersey, attorney; *Ms. Justus* and *Terry S. Bogorad,* Senior Assistant Passaic County Prosecutor, on the briefs).

*Gregory R. Mueller,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice ALBIN delivered the opinion of the Court.

A suspect has a right to remain silent while in police custody or under official interrogation, in accordance with his state law privilege against self-incrimination. In this case, we reaffirm that a suspect's silence while in custody, under interrogation, or "at or near" the time of his arrest cannot be used against him in a criminal trial. We agree with the Appellate Division that the prosecutor's improper use of defendant's pre-arrest silence as evidence of guilt requires the reversal of his conviction of criminal sexual contact. We disagree, however, with the appellate panel's conclusion that the trial court did not have a rational basis to instruct the jury on the charged offense of aggravated criminal sexual contact and the lesser-included offense of sexual contact. Because defendant's conviction was supported by sufficient evidence in the record, we also reject defendant's argument that any seeming inconsistency between the verdict acquitting him of the sexual assault charges and convicting him of sexual contact warranted a dismissal. We, therefore, vacate the panel's entry of a judgment of acquittal on the sexual contact charge. In light of the prosecutor's improper use of defendant's pre-arrest silence, we remand for a new trial.

## I.

A Passaic County grand jury indicted defendant Naseem Abdul Muhammad for first-degree kidnapping, *N.J.S.A.* 2C:13–1(b)(1); first-degree aggravated sexual assault, *N.J.S.A.* 2C:14–2(a)(6); and third-degree aggravated criminal sexual contact, *N.J.S.A.* 2C:14–3(a). The charges alleged that defendant abducted and raped M.M. The strange events that led to those charges were detailed at defendant's eight-day jury trial in April 2002.

M.M. testified that at approximately 11:30 p.m. on December 22, 1999, she was walking home from her cousin's house in Paterson through an area known for prostitution. As she approached the corner of Ellison Place and East 22nd Street, a slowly driven Nissan Maxima pulled up in front of her and stopped. Defendant, dressed in street clothes, stepped out of the vehicle, displayed a silver badge and identification card, and announced, "I'm a Paterson Police Officer, you're under arrest for soliciting prostitution."[1] M.M. denied that she was a prostitute, explaining that she lived around the corner and was on her way home. Unswayed, defendant told her that she was "going down for soliciting" and ordered her to get into the back seat of his car.

In the driver's seat, defendant drank from a 22–ounce bottle of Budweiser and repeated that M.M. was under arrest for prostitution. He drove to a dark, dead-end street, where he parked the car and told M.M., "if you do me right I'll let you go." After M.M. expressed uncertainty about the meaning of that offer, defendant said the words again and then climbed over the front seat into the back passenger area. Ignoring M.M.'s request to be taken to the police station, defendant put a condom on his penis, pulled M.M. by her hair, and forced her to perform oral sex. Afterwards, defendant ordered M.M. to take her clothes off. When she refused, defendant pulled her pants down, turned her over onto her stomach, and engaged in vaginal intercourse with her against her will for fifteen to twenty minutes until he ejaculated. Defendant then removed the condom, wrapped it in a paper towel, threw it on the floor of the car, and got dressed. As he exited from the rear door to return to the driver's seat, M.M. picked up the paper towel containing the condom and placed it in her pocket.

Back behind the wheel, defendant told M.M. to put on her clothes and get in the front passenger's seat. She refused, fearing

---

[1] Defendant had been a City of Passaic police officer for fifteen years until his termination from the force approximately one month before this incident. At the time of trial, defendant was appealing his termination.

that if she exited the car, defendant would take off and leave her behind. Instead, she asked to be taken to the local jail. As defendant drove through Paterson, M.M. pointed randomly to a house and told defendant that she lived there. However, when defendant offered to let her out, she said, "I want you to take me to jail because you said I'm soliciting prostitution." M.M. later declined defendant's offer of four dollars for "[her] time," and continued to insist that he take her to jail. As defendant drove, M.M. refused defendant's offer to take his cell phone and resisted several more requests that she move to the front seat, afraid that if she stepped from the vehicle he would leave her "standing" in the street.

Eventually, defendant and M.M. arrived at Paterson police headquarters. They entered the building together and proceeded to the desk sergeant. Defendant spoke first, telling the sergeant that he had brought M.M. in because she had been harassing his brother and sister. M.M. interrupted and accused defendant of lying, adding that defendant had identified himself as a police officer and had raped her. Then, from her pocket, she produced the condom, which she offered as proof.

The testimony of the desk sergeant, Alexander DeLuccia, shed further light on what occurred at headquarters. Sergeant DeLuccia testified that at approximately 1:15 a.m., M.M. and defendant appeared at his desk. Defendant identified himself as a Passaic police officer, displayed his identification card and badge, and told the sergeant that he had a "problem" with M.M. With tears streaming down her face, M.M. interjected, "[h]e forced me to have sex with him." In response, defendant gave his reasons for bringing M.M. to police headquarters. He explained that earlier that evening, he had gone to East 27th Street in Paterson "to visit his adult brother and sister," both of whom were "narcotics addicts." The brother told defendant that both he and their sister had been harassed by M.M., a neighborhood resident. When defendant caught sight of M.M. leaving her apartment, he "ordered her into his car" for the purpose of "scar[ing] her into

leaving his brother and sister alone." However, M.M. "became upset with his shouting" and "insisted that he take her to [h]eadquarters."

M.M. gave Sergeant DeLuccia an account at complete odds with defendant's story. She described how defendant abducted and raped her, and showed him a "paper towel curled up in her hand," which she identified as " 'the rubber that he used on me.' " At that point, defendant became nervous, stating he was married and wanted "to go home." The sergeant advised defendant that he could not leave and that there was "going to have to be an investigation." A police officer standing close by overheard that conversation and immediately positioned himself near defendant, and at the sergeant's direction, escorted defendant to the patrol captain's office lounge.

The follow-up investigation was conducted by Officer Louis DeLucca, who testified that in the early morning hours of December 23, he was dispatched to headquarters concerning an alleged sexual assault. He first interviewed M.M. and took from her, as evidence, the condom and paper towel in which it was wrapped. Officer DeLucca spoke briefly with defendant and placed him under arrest.

M.M. was taken to the hospital where she was given medication to prevent possible infection. The condom and paper towel were submitted to a laboratory for DNA testing. Both the State and defendant stipulated that material found on those items "included a mixture of DNA consistent with" defendant and M.M. The stipulation also provided that defendant was "the major contributor of the DNA" and that there was a "1 in 1.3 sextillion chance that the [d]efendant [was] not the source of the seminal material found on the paper towel."

The jury learned during M.M.'s testimony that she had convictions for child abuse, distribution of drugs, and shoplifting; that she had been arrested for creating a public disturbance and stabbing her brother; and that she had several aliases. The jury also learned that M.M. weighed over 210 pounds on the night of

the incident and that there were no rips or tears in the pants she wore that evening. Using those facts, defense counsel attempted to cast doubt on M.M.'s account of the assault in the back seat of the Maxima, suggesting that, based on her size, the sexual assault could not have occurred as she had testified. M.M. stated that she had never been a prostitute. She explained that as a result of the sexual assault, she suffered psychological trauma and nightmares, sought counseling for two years, and took illegal drugs "as a way out."

Defendant did not testify.

Defendant's counsel, in his opening and closing remarks, suggested that M.M. was a prostitute with whom defendant had a consensual sexual encounter. In turn, the prosecutor, through questioning of witnesses and in his opening and closing remarks, repeatedly referenced defendant's failure to make any mention at police headquarters of a consensual encounter with M.M. or that she was a prostitute.

First, in his opening statement, the prosecutor remarked:

When [defendant is] at the police department he explains how it is that he and [M.M.] came together that night, and he doesn't say that she was a prostitute. . . . He did not say he picked her up to have sex with her. He did not say that she was a prostitute.

The court overruled defendant's objection to those comments and denied his motion for a mistrial.

Then, in his examination of Sergeant DeLuccia, the prosecutor focused in on defendant's silence at the police station:

Q: In addition to telling you that he picked up [M.M.] in order to scare her because she had been bothering his brother or sister, *did [defendant] say anything to you about having sex with [M.M.]?*

A: *No. Nothing.*

Q: *Did the subject of her being a prostitute ever come up?*

A: *No sir.*

[ (Emphasis added).]

The prosecutor followed up by asking:

Q: From the moment that you first saw [defendant] to the time that you went off duty that morning, did the subject ever come up concerning prostitution ... ?

The court sustained a defense objection because the breadth of the question possibly encompassed the time after defendant's formal arrest and, therefore, "touch[ed]" on "[d]efendant's exercise of his Fifth Amendment privilege." The prosecutor then rephrased the question:

Q: Sergeant, from the moment that you first laid eyes on [defendant and M.M.], from the time that you saw them coming in that clear door, to the time that [M.M.] was taken to the front of the Police Department and [defendant] was escorted to another room and you lost sight of the two, from point A to point B as I've just outlined it, *did [defendant] ever say to you anything with regard to prostitution or allege that [M.M.] was a prostitute?*

A: *No sir.*

Q: *Did the subject of prostitution ever come up during that period of time?*

A: *No sir.*

[ (Emphasis added).]

On direct examination of Officer DeLucca, the prosecutor continued to develop the theme of defendant's silence about prostitution:

Q: Now, at some point after you, in the company of the Captain, meet with [defendant], after you get his name, after he produces a police badge—Passaic police badge, after he produces the Passaic housing officer ID card, and after he identifies himself as a Passaic police officer, he was actually formally placed under arrest, correct?

A: Correct.

Q: Before that happened, *from the time you first met him to the time that he was placed under arrest, did the subject of prostitution ever come up between you, the Captain or the Defendant?*

A: *No.*

[ (Emphasis added).]

Over the objections of defense counsel, the prosecutor in summation continued to drive home defendant's failure to provide the Paterson police with his trial defense.

On December 22, 1999, minutes after this incident occurs, the defendant goes into the Paterson Police Department with [M.M.] and he stakes out his position. In effect he says here I stand, this is my position, and *he never said, in staking out his position, that [M.M.] was a prostitute.*

. . . .

[Defendant] said he found [M.M.] around 27th Street and he said not that he picked her up as a prostitute, not that he had sex with her. He didn't say that. What he said was he picked her up and ordered her in the car. He ordered her

into the car. Why? So he could scare her. Not so that he could have sex with her, not so that he could hire her as a prostitute. . . .

*He didn't say she was a prostitute. He didn't say [ ] he hired a prostitute. He didn't say he hired a prostitute. He didn't say he had sex with her during an act of, an act of prostitution. He didn't say any of that.*

. . . .

*And don't you think that if [defendant] were engaged in prostitution, that would be the time to say it? But he didn't. You know why? Because he wasn't.*
[ (Emphasis added).]

The court refused to grant defendant's motion for a mistrial at the completion of the prosecutor's closing or to give a curative or limiting instruction.

The jury acquitted defendant of first-degree kidnapping, first-degree aggravated sexual assault, third-degree aggravated criminal sexual contact, and the lesser-included offense of second-degree sexual assault. The jury convicted defendant of the lesser-included offense of fourth-degree criminal sexual contact, *N.J.S.A.* 2C:14–3(b), and deadlocked on the lesser-included charge of second-degree kidnapping, *N.J.S.A.* 2C:13–1(c). On the State's motion, the trial court dismissed the second-degree kidnapping charge. On the criminal sexual contact conviction, the court sentenced defendant to an eighteen-month State Prison term and imposed appropriate fees and penalties.

The Appellate Division, relying on *State v. Deatore,* 70 *N.J.* 100, 358 *A.*2d 163 (1976), and *State v. Brown,* 118 *N.J.* 595, 573 *A.*2d 886 (1990), reversed the conviction, holding that the prosecutor's repeated use of defendant's silence "at or near" the time of his arrest, as evidence of guilt, violated defendant's state privilege against self-incrimination. *State v. Muhammed,* 366 *N.J.Super.* 185, 197–99, 201–02, 840 *A.*2d 928 (App.Div.2004).[2] The panel found that while in custody at headquarters, defendant was not required to provide the police with the defense that he presented a trial. *Id.* at 200–202, 840 *A.*2d 928. The panel noted that "the State's repeated references to defendant's failure to disclose his"

---

[2] The caption of the Appellate Division opinion has an error in the spelling of defendant's name.

consent defense "impermissibly penalized defendant for legitimately exercising his constitutional and common law right" to remain silent in the face of an accusation. *Id.* at 201, 202, 840 *A.*2d 928. The panel concluded that "the trial judge committed reversible error in permitting the prosecutor to repeatedly comment on defendant's failure to disclose the version of events suggested for the first time at trial." *Id.* at 205, 840 *A.*2d 928.

The Appellate Division also held that the trial court erred when it charged the jury on the lesser-included offense of criminal sexual contact. *Id.* at 208, 840 *A.*2d 928. According to the panel, the evidence of forced vaginal and oral penetration supported only the aggravated sexual assault charge and not the sexual contact charge, which was premised on a theory of intentional touching. *Id.* at 207–208, 840 *A.*2d 928. The panel, therefore, found that the proofs did not justify a conviction of sexual contact and remanded for the entry of a judgment of acquittal on that charge. *Ibid.* We granted the State's petition for certification. *State v. Muhammed,* 180 *N.J.* 151, 849 *A.*2d 184 (2004).

## II.

We first address whether the prosecutor impermissibly used defendant's silence at Paterson police headquarters as evidence of his guilt in violation of his state law right against self-incrimination. The State claims that the prosecutor was commenting not on defendant's silence, but on his statement to the desk sergeant, which was inconsistent with his defense at trial. Alternatively, the State argues that any possible reference to defendant's pre-arrest silence did not violate defendant's state or federal right against self-incrimination. We disagree.

## A.

The prosecutor's arguments to the jury and the answers he elicited from the police witnesses were direct references to defendant's silence. Making reference at trial to what a defendant did not say to the police is commenting on his silence. *See*

*State v. Lyle,* 73 *N.J.* 403, 406 n. 1, 407 n. 4, 408 n. 5, 410, 375 *A.*2d 629 (1977) (per curiam); *Deatore, supra,* 70 *N.J.* at 107, 115–16, 358 *A.*2d 163. The prosecutor reminded the jury that defendant did not give the police the consent defense that his counsel raised at trial and faulted defendant for remaining silent at headquarters. In his opening, the prosecutor harped on the fact that at the police station, defendant "did not say he picked [M.M.] up to have sex with her. He did not say that she was a prostitute." In his closing, the prosecutor made the same point, arguing that defendant only told the police that he had picked M.M. up to scare her and that "[h]e didn't say he had sex with her during an act of, an act of prostitution." Those characterizations came from answers elicited by the prosecutor during his examination of two police witnesses.

We cannot accept the State's depiction of the prosecutor's remarks as merely highlighting the inconsistency between defendant's statement at police headquarters and the defense advanced by his attorney. In assailing defendant's consent defense, the prosecutor's leitmotif was defendant's silence at police headquarters. The prosecutor was entitled to let the jury know that defendant's claim to the police that he picked M.M. up for harassment stood in stark contrast to his attorney's trial argument of a consensual sexual encounter. However, the prosecutor went far beyond pointing out that significant inconsistency; instead the prosecutor called for the jury to reject the consent defense because defendant remained silent when he had the opportunity to present it to the police.[3] Here, the prosecutor's thrust was that both before and after M.M. accused him of rape, defendant did not give to the police the exculpatory account that his counsel provided to the jury. In other words, the prosecutor impaled defendant

---

[3] We agree with our concurring colleague that the prosecutor could argue that defendant's statement to the police was inconsistent with the defense that he offered at trial. We disagree, however, with our colleague's assertion that defendant's silence—or the statement he did *not* make to the police—can be used against him in this case.

on his silence, intimating that an innocent man would not have stopped speaking to the police officers, but would have revealed to them the defense offered as truth at trial. We conclude that the prosecutor elicited testimony and commented on defendant's silence at police headquarters to impugn his defense at trial.

### B.

Next, we must decide whether the prosecutor's use of defendant's silence violated his state law right against self-incrimination. New Jersey's privilege against self-incrimination, although not enshrined in the State Constitution, is deeply rooted in this State's common law and codified in both statute and an evidence rule. *N.J.S.A.* 2A:84A–19 and *N.J.R.E.* 503 both provide in identical language that "every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate. . . ."

"[T]he right of . . . a suspect to remain silent when in police custody or under interrogation has always been a fundamental aspect of the privilege in this state." *Deatore, supra,* 70 *N.J.* at 114, 358 *A.*2d 163. When in custody, a suspect "is privileged to say nothing" at all to the police and "is under no duty to give a statement. . . ." *State v. Ripa,* 45 *N.J.* 199, 204, 212 *A.*2d 22 (1965) (per curiam). The reason for a suspect's silence in a police dominated setting cannot easily be discerned. Because we cannot know whether a suspect is acquiescing to the truth of an accusation or merely asserting his privilege, such silence is "equivocal." *Id.* at 203, 212 *A.*2d 22. We have recognized that a "likely explanation" for a suspect's silence while under official interrogation or in custody may be that he is exercising his right "to remain silent." *Id.* at 203, 212 *A.*2d 22. Therefore, we do not permit a jury to infer guilt from that silence. *Id.* at 203–04, 212 *A.*2d 22.

In addition, a suspect who initially responds to police questioning may later assert his right to remain silent without fear

that his silence will be used to incriminate him at trial. A suspect who begins to speak to the police while in custody, during interrogation, or "at or near" the time of his arrest does not waive his right against self-incrimination when he falls silent—the words he could have spoken cannot be used against him. *See, e.g., Lyle, supra,* 73 *N.J.* at 405, 406, 410, 375 *A.*2d 629 (holding that defendant who remains silent after giving account of crime to police may not be impeached at trial with that silence); *Ripa, supra,* 45 *N.J.* at 204, 212 *A.*2d 22 (holding that no negative inference could be drawn against defendant based on his exercise of right to remain silent after providing information to police). In other words, by speaking with the police, a suspect does not waive his right to invoke the privilege and remain silent at some later point.

Our state-law privilege against self-incrimination offers broader protection than its federal counterpart under the Fifth Amendment.[4] *See State v. Strong,* 110 *N.J.* 583, 595, 542 *A.*2d 866 (1988); *see also Deatore, supra,* 70 *N.J.* at 112–16, 358 *A.*2d 163. If a defendant remains silent after being arrested and given *Miranda*[5] warnings, both state and federal law prohibit a prosecutor from using that silence against him. *Doyle v. Ohio,* 426 *U.S.* 610, 619, 96 *S.Ct.* 2240, 2245, 49 *L.Ed.*2d 91, 98 (1976) (holding that "the use for impeachment purposes of [defendants'] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment" (footnote omitted)). On the other hand, federal law generally permits the use of pre-arrest silence to impeach a defendant. *Jenkins v. Anderson,* 447 *U.S.* 231, 238–39, 100 *S.Ct.* 2124, 2129, 65 *L.Ed.*2d 86, 94–95 (1980) (holding that Self–Incrimination Clause of Fifth Amendment and Due Process Clause of Fourteenth Amendment are not violated by use of defendant's pre-arrest and pre-*Miranda*

---

4 The Fifth Amendment guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." *U.S. Const.* amend. V.

5 *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

warning silence to impeach his credibility); *see also Fletcher v. Weir*, 455 *U.S.* 603, 607, 102 *S.Ct.* 1309, 1312, 71 *L.Ed.*2d 490, 494 (1982) (per curiam) (holding that due process was not violated by prosecutor's comments on defendant's silence following his arrest but before he received *Miranda* warnings because of "the absence of the sort of affirmative assurances embodied in the Miranda warnings").

In contrast, under New Jersey law, the admissibility of a defendant's pre-arrest silence is not determined based on whether the silence arose before or after the police administered *Miranda* warnings. Our state law privilege does not allow a prosecutor to use at trial a defendant's silence when that silence arises "at or near" the time of arrest, during official interrogation, or while in police custody. *See Deatore, supra*, 70 *N.J.* at 108–09, 358 *A.*2d 163; *see also Brown, supra*, 118 *N.J.* at 610, 573 *A.*2d 886. Barring the use of silence "at or near" the time of arrest avoids the often murky inquiry into pinpointing the precise moment a suspect is placed in custody or under arrest.

In *Deatore, supra*, we concluded that the State could not impeach a defendant with his silence while under interrogation by the police "at or near" the time of his arrest. 70 *N.J.* at 108–09, 358 *A.*2d 163. The defendant in that case was on trial for armed robbery and presented an alibi defense. *Id.* at 103, 358 *A.*2d 163. He testified that he was in a woman's company in a motel room at the time of the crime. *Id.* at 103–04, 358 *A.*2d 163. On cross-examination, the prosecutor asked whether he had given that account to the police "when he was arrested and later when he learned of the specific charge against him." *Id.* at 107, 358 *A.*2d 163. The defendant replied that he only remembered asking for a receipt for money taken from him by the police. *Ibid.* In response to the prosecutor's question whether he had refused to make a statement to the police, the defendant stated, " '[n]obody asked me.' " *Ibid.* The State offered no rebuttal testimony to the defendant's response, and the prosecutor did not mention the defendant's silence for the balance of the trial, including summa-

tion. *Id.* at 107–08, 358 *A.2d* 163. Defendant was convicted of the crime. *Id.* at 103, 358 *A.2d* 163.

In affirming the Appellate Division's reversal of defendant's conviction, this Court concluded that the prosecutor's questioning violated the defendant's state law privilege against self-incrimination. *Id.* at 115–16, 358 *A.2d* 163. We held that "a defendant is under no obligation to volunteer to the authorities at the first opportunity the exculpatory story he later tells at his trial and cannot be penalized directly or indirectly if he does not." *Id.* at 115, 358 *A.2d* 163. Because the privilege gives a person the right to refuse to disclose to a police officer any matter that will incriminate him, we rejected the State's reasoning that an innocent person would have volunteered the exculpatory statement at the earliest possible moment to avoid a trial and possible conviction. *Id.* at 108–09, 358 *A.2d* 163; *see also N.J.S.A.* 2A:84A–19; *N.J.R.E.* 503.

We applied our holding in *Deatore, supra,* a year later in *Lyle, supra,* a case involving the improper use of a suspect's silence that presents parallels to the case before us now. 73 *N.J.* at 405, 375 *A.2d* 629. In *Lyle, supra,* the defendant shot and killed a man allegedly involved in a romantic "dalliance" with his wife. *Ibid.* When Detective Friday arrived at the murder scene, the store where the defendant worked, the defendant stepped forward and said " 'Yes, I'm Henry. I shot him.' " *Id.* at 406, 375 *A.2d* 629. The defendant was then arrested, given *Miranda* warnings, and said nothing more to Detective Friday at the crime scene. *Ibid.* At trial, the defendant claimed that he acted in self-defense and only killed the decedent after the decedent had attacked him with a screwdriver. *Id.* at 405–06, 375 *A.2d* 629.

The prosecutor repeatedly questioned both the defendant and Detective Friday about the defendant's failure to give that account at the time he admitted the killing. *Id.* at 406 n. 1, 407 n. 4, 408 n. 5, 375 *A.2d* 629. Additionally, in summation, the prosecutor argued " 'here is a man who has told you that he killed in self defense, that [the decedent] came at him with a screwdriver, and yet the

policeman who was there within moments ... of the killing, ... he doesn't mention anything at all about the screwdriver to him.' " *Id.* at 409, 375 *A.*2d 629. That the defendant gave only a partial account to the police at or near the time of his arrest did not open the door to prosecutorial questioning about what the defendant did not tell to the police. *See id.* at 405, 410, 375 *A.*2d 629. Relying on *Deatore, supra,* we reversed the defendant's conviction because "it was manifestly improper to use defendant's silence to attack his self-defense theory as a fabrication." *Id.* at 410, 375 *A.*2d 629.[6]

In *Brown, supra,* we reaffirmed the principle of *Deatore, supra,* and clearly stated that a suspect has "the right to remain silent when in police custody or under interrogation" and that his "silence 'at or near' the time of his arrest may not be introduced to impeach his credibility." 118 *N.J.* at 610, 573 *A.*2d 886. In *Brown, supra,* we held that a defendant's pre-arrest silence could be used for impeachment purposes if that silence "significantly" preceded his arrest and did not arise in a custodial or interrogation setting. *Id.* at 610, 613, 573 *A.*2d 886. In that case, defendant Emm and co-defendant Brown tailgated and passed each other on a highway until Brown's car struck an innocent motorist traveling in the opposite lane of traffic. *Id.* at 600, 573 *A.*2d 886. Emm then drove to a volunteer fire company of which he was a member and returned to the accident scene to assist the victims. *Id.* at 602, 573 *A.*2d 886. Although Emm was in the presence of police and first-aid workers at the scene, he said not a word about his involvement in the tragic events. *Id.* at 602–03, 573 *A.*2d 886. Two days later, Emm came forward to the police to explain his part in the collision. *Id.* at 603, 573 *A.*2d 886. At trial, Emm testified that he was innocent of any wrongdoing and a victim of Brown's reckless antics on the roadway. *Id.* at 601, 573 *A.*2d 886. The prosecutor and Brown's counsel impeached Emm with his silence at the accident scene. *Id.* at 610, 573 *A.*2d 886.

---

[6] The position espoused by our concurring colleague is similar to the one that was raised by the dissent in *Lyle, supra,* and rejected by this Court. 73 *N.J.* at 414, 418, 375 *A.*2d 629 (Conford, P.J.A.D., dissenting).

This Court held that in the absence of "governmental compulsion," Emm's pre-arrest silence was admissible for impeachment purposes because the jury was entitled to infer that "a reasonable person situated as the defendant ... would naturally have come forward and mentioned his ... involvement" to the police at the accident scene. *Id.* at 613, 573 *A.*2d 886. The Court concluded that in circumstances not involving official interrogation or a custodial setting, silence significantly preceding arrest is admissible if "it generates an inference of consciousness of guilt that bears on the credibility of the defendant when measured against the defendant's apparent exculpatory testimony." *Id.* at 613, 615, 573 *A.*2d 886. Based on the facts in *Brown, supra,* this Court found that it was up to the jury to assess the probative value of the defendant's silence—"whether [it] entailed a consciousness of guilt, a desire not to become involved, a feeling that it was simply unnecessary, or a belief that he had already fulfilled whatever duty he had...." [7] *Id.* at 615, 573 *A.*2d 886.

The present case falls squarely within the ambit of *Deatore, supra,* and *Lyle, supra.* Defendant brought M.M. to Paterson police headquarters and told the desk sergeant that she had been harassing his family. When M.M. accused defendant of raping her and produced a used condom as proof, Sergeant Deluccia told defendant he could not leave, and effectively placed him in custo-

---

[7] Conspicuously missing from the Court's list of possible reasons for Emm's silence was that Emm might simply have been exercising the right not to incriminate himself. The *Brown* Court ruled that under our state law privilege a "defendant has no right *not* to speak prior to arrest" in the absence of official compulsion. *Brown, supra,* 118 *N.J.* at 613, 573 *A.*2d 886. That interpretation of New Jersey's privilege against self-incrimination in *Brown, supra,* contrasts with the broad language in *Deatore, supra,* in which we stated that " 'a suspect is under no duty to give a statement; on the contrary he is privileged to say nothing.' " 70 *N.J.* at 113, 358 *A.*2d 163 (quoting *Ripa, supra,* 45 *N.J.* at 204, 212 *A.*2d 22). Under the formulation in *Brown, supra,* the defendant had the Hobson's choice of either speaking to the police at the scene and incriminating himself or invoking his right to remain silent, in which case his silence could be used against him. Any tension between the language in *Deatore, supra,* and *Brown, supra,* need not be resolved in this case.

dy. With his freedom curtailed, defendant fell silent. A short while later, an officer escorted defendant to the captain's lounge where he remained until his arrest, all the while keeping his silence. As in *Lyle, supra,* before invoking silence at the scene, defendant gave to the police a different account from the one he relied on at trial.

The prosecutor here repeatedly elicited testimony and made comments on defendant's silence both "at or near" the time of his arrest and when he was in police custody. In questioning both Sergeant DeLuccia and Officer DeLucca, the prosecutor pointedly elicited testimony that defendant remained silent while detained at headquarters. The prosecutor's references to defendant's failure to tell the police officers about a consensual sexual relationship with M.M. were so broad that they encompassed the entire period defendant was in custody at headquarters. For example, the prosecutor's opening statement referred to defendant's silence while "at the police department," a time that included when he had been placed under arrest.

Those references in which the prosecutor drew inferences of guilt from defendant's silence were patent violations of *Deatore, supra,* and *Lyle, supra.* Defendant was not obliged to give the police the exculpatory story his attorney presented at trial, and the State was not permitted to use his silence to convict him.[8] *See Deatore, supra,* 70 *N.J.* at 114, 358 *A.2d* 163; *see also*

___

[8] We also note that the cases before this Court addressing the use of a defendant's pre-arrest silence have all arisen in the context of a prosecutor impeaching a testifying defendant with his silence. *See Brown, supra,* 118 *N.J.* at 616, 573 *A.2d* 886; *Lyle, supra,* 73 *N.J.* at 408 n. 5, 375 *A.2d* 629; *Deatore, supra,* 70 *N.J.* at 115–16, 358 *A.2d* 163. In this case, defendant did not testify and, therefore, his silence was not used for impeachment purposes, but rather as substantive evidence of guilt. This Court has yet to hold whether there are any circumstances in which a non-testifying defendant's failure to give a pre-arrest account to police may be used as substantive evidence of his guilt at trial. Because we resolve this case on the narrow ground that the silence referenced was in a custodial setting, "at or near" the time of arrest, we need not address that question.

*Ripa, supra,* 45 *N.J.* at 204, 212 *A.*2d 22. Because we conclude that the prosecutor's violation of defendant's state law privilege against self-incrimination was "clearly capable of producing an unjust result," *R.* 2:10–2; *see also State v. Macon,* 57 *N.J.* 325, 337, 273 *A.*2d 1 (1971), we are constrained to reverse defendant's conviction.

### III.

Next, we consider whether the trial court committed plain error in charging criminal sexual contact to the jury. The Appellate Division noted that "fourth-degree criminal sexual contact [was] squarely included in the offense of aggravated criminal sexual contact," which was charged in the indictment. *Muhammed, supra,* 366 *N.J.Super.* at 207, 840 *A.*2d 928. The appellate panel determined, however, that "neither crime [was] rationally based in, much less clearly indicated by, the evidence adduced at trial" and vacated the conviction of sexual contact. *Id.* at 207, 208, 840 *A.*2d 928. Finding that the State did not meet its burden of proof on that charge, the panel, in effect, entered a judgment of acquittal, thus barring a retrial. *Id.* at 208, 840 *A.*2d 928.

Defendant submits that we should affirm the panel's opinion. In addition, he claims that the jury's inconsistent verdicts—acquittal on the sexual assault charge and guilt on the sexual contact charge—required the overturning of the conviction. Because we conclude that the trial court had a rational basis to charge the lesser-included offense of sexual contact, and because even a purportedly inconsistent verdict does not bar a conviction that is supported by the record, we reverse.

The indictment returned by the Passaic County grand jury charged defendant with first-degree kidnapping, second-degree aggravated sexual assault, and third-degree aggravated sexual contact. The State was permitted to charge defendant in the alternative or with the greater and lesser degree of the same cognate offenses. *See N.J.S.A.* 2C:1–8(a) ("When the same con-

duct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense."). A single criminal transaction may violate more than one statute and be charged in several counts of an indictment. *State v. La Fera*, 35 *N.J.* 75, 91, 171 *A.*2d 311 (1961) (holding that "[e]ven inconsistent or repugnant charges arising out of the same affair may be joined," provided there is sufficient evidence to support charge (citations omitted)).

Accordingly, a grand jury may include in an indictment charges that allege alternative theories of guilt. To illustrate, indictments in drug cases often include both the greater and lesser charge, i.e., possession of a controlled dangerous substance with the intent to distribute and mere possession of that substance. *See, e.g., State v. Smith*, 155 *N.J.* 83, 90, 713 *A.*2d 1033 (1998) ("Grand Jury indicted defendant, charging him with third degree possession of a controlled dangerous substance (CDS) (count one), third degree possession of a CDS with intent to distribute (count two), and third degree possession of a CDS with intent to distribute within 1000 feet of a school (count three)."). The State need not proceed by charging on an all-or-nothing basis, but may instead take account of the realities of the criminal justice system.

The State's burden of proof in returning an indictment is to present the grand jury with a *prima facie* case, whereas its burden at trial is to present the petit jury with proof beyond a reasonable doubt. Those differing standards make it likely that not all charges returned by a grand jury will be proven at trial. Returning to the example of the drug case, the petit jury may determine that there is reasonable doubt that a defendant possessed a controlled substance with the intent to distribute, but have no such doubt that he possessed the illicit substance. The salient point is that the grand jury is empowered to bring criminal charges on greater and lesser-included offenses based on probable cause for ultimate determination by a trial jury.

Here, the grand jury charged defendant with aggravated sexual assault, which requires proof of (1) "penetration" (2) by "physical force or coercion" and (3) "severe personal injury ... sustained by the victim." *N.J.S.A.* 2C:14–2(a)(6). The lesser-included crime of sexual assault, *N.J.S.A.* 2C:14–2(c)(1), contains the first two elements but not the third of "severe personal injury." The grand jury also charged defendant with aggravated criminal sexual contact, which requires proof of (1) "sexual contact" (2) by physical force or coercion and (3) severe personal injury sustained by the victim. *N.J.S.A.* 2C:14–3(a). The lesser-included offense of criminal sexual contact contains the first two elements but not the third of severe personal injury. *N.J.S.A.* 2C:14–3(b).

"Sexual contact" is defined as "an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor." *N.J.S.A.* 2C:14–1(d). This form of intentional touching could be a necessary prelude to the act of penetration or could occur without penetration at all. Additionally, sexual contact occurs under the statute even if the defendant only touches himself, i.e., masturbates, "in view of the victim." *Ibid.*

The grand jury obviously found evidence of sexual penetration and evidence of sexual contact. Defendant did not file a motion to dismiss count three of the indictment charging aggravated sexual contact based on insufficiency of evidence. At the end of the State's case, defendant did not file a motion for a judgment of acquittal on the ground of lack of evidence. Defendant never objected to the trial court instructing the jury on the lesser-included offense of criminal sexual contact, although he did object to the court charging several other lesser-included offenses, including lewdness. One may reasonably surmise that defendant raised no such objection at trial because he was content to give the jury the option of finding him guilty of a less serious offense, and because he saw no basis to challenge the sufficiency of the evidence on the sexual contact charge.

Now, defendant submits that based on M.M.'s testimony, the evidence supported only one theory—sexual assault—and that the jury's only choice should have been between a conviction of that crime and acquittal. He argues that the State never proceeded on a theory of "mere" intentional contact. That argument, however, is refuted by the fact that the indictment itself contained the charge of aggravated criminal sexual contact. Moreover, no one questions that sexual contact is an appropriate lesser-included offense of aggravated sexual contact.

"[T]he integrity of . . . the fact-finding process is not subordinate to the singular interests" of any party. *State v. Garron*, 177 *N.J.* 147, 180, 827 *A.*2d 243 (2003), *cert. denied*, 540 *U.S.* 1160, 124 *S.Ct.* 1169, 157 *L.Ed.*2d 1204 (2004). We have instructed our trial courts "that their primary obligation is to see that justice is done, and that a jury is instructed properly on the law and on all clearly indicated lesser-included offenses, even if at odds with the strategic considerations of counsel." *Ibid.* As we said in *Garron, supra,* "[n]o defendant should be convicted of a greater crime or acquitted merely because the jury was precluded from considering a lesser offense. . . ." *Ibid.* When a court charges a lesser-included offense and neither party objects, as in this case, we will uphold a conviction of the lesser charge so long as the evidence in the record provides rational support for the conviction.

We have long recognized that "[a] jury is not bound to believe the testimony of any witness, in whole or in part." *State v. Bentley Bootery, Inc.*, 128 *N.J.L.* 555, 561, 27 *A.*2d 620 (Sup.Ct. 1942), *aff'd o.b.*, 129 *N.J.L.* 386, 387, 30 *A.*2d 27 (E. & A.1943) (per curiam). Jurors "may reject what in their conscientious judgment ought to be rejected and accept that which they believe to be credible." *Ibid.* The model jury charge specifically instructs jurors that they must "determine the weight" to be given to the testimony of each witness and that they "may accept all . . . , a portion . . . , or none" of that witness's testimony. *Model Jury Charge (Criminal)*, Credibility of Witnesses (2003). The jurors in this case were entitled to believe all, none, or part of the account

offered by M.M. She testified that defendant raped her, an act that by its nature involves physical contact between the assailant and the victim. The verdicts might reflect the fact that the jury credited part and rejected part of M.M.'s testimony, and concluded that defendant touched M.M. or himself in her presence, but did not penetrate her. We disagree with the finding of the Appellate Division that insufficient evidence was presented to sustain a conviction for criminal sexual contact.

Defendant also claims that the conviction for sexual contact was an unlawful compromise verdict because any contact between defendant and M.M. was necessarily incidental to sexual penetration and because the jury acquitted defendant of first-degree aggravated sexual assault and second-degree sexual assault. We do not accept defendant's premise that the verdicts were necessarily inconsistent, but even if we did, we would reject his claim for relief. " 'Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment.' " *State v. Banko*, 182 *N.J.* 44, 53, 861 *A.*2d 110 (2004) (quoting *Dunn v. United States*, 284 *U.S.* 390, 393, 52 *S.Ct.* 189, 190, 76 *L.Ed.* 356, 358–59 (1932)). Our jurisprudence does not allow us to conjecture regarding the nature of the deliberations in the jury room. *State v. Grey*, 147 *N.J.* 4, 11, 685 *A.*2d 923 (1996). In reviewing a jury finding, we do not attempt to reconcile the counts on which the jury returned a verdict of guilty and not guilty. *See State v. Federico*, 103 *N.J.* 169, 176–77, 510 *A.*2d 1147 (1986). Instead, we determine whether the evidence in the record was sufficient to support a conviction on any count on which the jury found the defendant guilty. *Banko, supra*, 182 *N.J.* at 54–55, 861 *A.*2d 110 (citations omitted); *see also State v. Petties*, 139 *N.J.* 310, 319, 654 *A.*2d 979 (1995); *State v. Kamienski*, 254 *N.J.Super.* 75, 95, 603 *A.*2d 78 (App.Div.), *certif. denied*, 130 *N.J.* 18, 611 *A.*2d 656 (1992). We do not speculate whether verdicts resulted from jury lenity, mistake, or compromise, *Grey, supra*, 147 *N.J.* at 11, 685 *A.*2d 923, and we will not do so here. Accordingly, there is no bar to a retrial on the charge of criminal sexual contact.

## IV.

In conclusion, we affirm the Appellate Division's holding that the prosecutor improperly elicited testimony and commented on defendant's silence, thus denying him a fair trial. We reverse the Appellate Division's holding that insufficient evidence was submitted to the jury to support a charge on criminal sexual contact. We remand for a new trial on the charge of criminal sexual contact consistent with this opinion.

Justice RIVERA–SOTO concurring in the result.

To the extent the majority holds that "a suspect's silence while in custody, under interrogation, or 'at or near' the time of his arrest cannot be used against him in a criminal trial," *ante,* 182 *N.J.* at 558, 868 *A.*2d at 305, I concur. However, I cannot concur with the majority's application of that holding because, in my view, the majority falls prey to the same overbroad analysis that ultimately dooms the prosecutor's efforts in this case.

The prosecution, through both testimony and argument, referenced the statements and conduct of defendant Naseem Abdul Muhammad during his stay at the Paterson Police Headquarters and repeatedly questioned whether defendant made any reference then to the defense he later advanced at trial. Significantly, defendant's statements at police headquarters fell within two discrete categories: those statements defendant made to the desk sergeant, Sergeant DeLuccia, when defendant entered police headquarters and accused the victim, M.M., of harassing defendant's brother and sister, and those statements—or, more accurately, defendant's silence—after he was restrained in the captain's office and was interrogated by Officer DeLucca. The majority condemns both statements as impermissible comments on defendant's silence " 'at or near' the time of his arrest." There is, however, a fundamental difference between defendant's statement to Sergeant DeLuccia and defendant's post-custody silence in response to Officer DeLucca's questions. That difference is glossed over by the majority; yet it is a distinction that bears both

acknowledgment and recognition in this context. Therefore, although I ultimately concur in the result reached by the majority, I write separately to highlight that difference.

## I.

The relevant facts of this case are succinctly stated by the majority and need not be repeated here. However, it is instructive to note that, after defendant arrived voluntarily at the Paterson Police Headquarters in the company of M.M. and accused M.M. of harassing defendant's brother and sister, M.M. broke down and, crying, accused defendant of sexual assault and produced physical evidence corroborating her version of events. Defendant, who to that point had been quite talkative, told Sergeant DeLuccia that defendant was married and just wanted to go home. Confronted as he was with two disparate versions, Sergeant DeLuccia told defendant that he was not free to leave and instructed another police officer to place defendant in the captain's office. While in the captain's office, defendant did not answer any questions posed to him by Officer DeLucca. Some time later, defendant was formally arrested and charged with a series of sexual offenses.

At trial, defendant was confronted with positive proof that he had engaged in an act of sexual intercourse with M.M. As his defense, defendant admitted that he had engaged in sexual intercourse with M.M., but claimed it was consensual, a claim defendant never made while at police headquarters.[1] To rebut this defense, the prosecution elicited testimony from both Sergeant DeLuccia and Officer DeLucca to the effect that defendant made no such claim while at police headquarters. The prosecution attacked this defense as nothing more than a recent fabrication by defendant, highlighting both in testimony and argument that, while defendant was at police headquarters, defendant made no reference to the facts that he claimed as a defense at trial.

---

[1] This defense was advanced by defendant's counsel, as defendant did not testify at trial.

## II.

### A.

Ultimately, the vice inherent in the approach taken by the prosecution was its breadth. As noted, there were two distinct issues related to defendant's stationhouse behavior: defendant's statement to Sergeant DeLuccia, and defendant's post-custody silence in response to Officer DeLucca's questions. I agree with the majority to the extent that, in its questions of Officer DeLucca as well as in its references to defendant's post-custody silence in response to Officer DeLucca's inquiries, the prosecution went too far and improperly commented on defendant's silence "at or near" the time of his arrest. I must part company, however, with the majority inasmuch as the statements defendant made or did not make to Sergeant DeLuccia—and the prosecution's references in argument to what defendant did or did not say to Sergeant DeLuccia—were proper as they do not implicate the prohibition against references to a defendant's silence "at or near" the time of his arrest as set forth in *State v. Deatore*, 70 *N.J.* 100, 358 *A.*2d 163 (1976).

### B.

As a matter of federal constitutional law, *Doyle v. Ohio*, 426 *U.S.* 610, 96 *S.Ct.* 2240, 49 *L.Ed.*2d 91 (1976), prohibits any reference to a defendant's post-arrest and post-*Miranda*[2] warnings silence. The rule of *Doyle v. Ohio* was not foreign to our law. Eleven years before *Doyle v. Ohio*, that prohibition was engrained in New Jersey's jurisprudence. *State v. Ripa*, 45 *N.J.* 199, 204, 212 *A.*2d 22 (1965) ("[W]hen a defendant expressly refuses to answer, no inference can be drawn against him under the doctrine of acquiescence by silence or any other concept."). More to the point, two months before *Doyle v. Ohio* was decided, we "settled" the question whether, as a matter of New Jersey law, a defendant

---

2 *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

can be cross-examined on the basis of his failure to provide his exculpatory version in the more expansive context of "at or near" the time of his arrest by concluding that

> we are of the view that such questioning is improper. We reach that conclusion as a matter of state law and policy, as to which we may impose standards more strict than required by the federal Constitution, which standards will control regardless of the final outcome of the question in the federal sphere.
>
> The reasons for the stated conclusion rest in two categories. The first derives from the privilege against self-incrimination which is enshrined in the common law; the second from basic principles of evidence law.
>
> [*State v. Deatore, supra,* 70 *N.J.* at 112–13, 358 *A.*2d 163 (citations and footnotes omitted).]

As the majority aptly points out, the principles of *State v. Deatore* have been consistently reaffirmed. *State v. Lyle,* 73 *N.J.* 403, 375 *A.*2d 629 (1977); *State v. Brown,* 118 *N.J.* 595, 573 *A.*2d 886 (1990).

The majority, however, ignores a distinction underscored in *Deatore, Lyle* and *Brown:* the prohibition against comment concerning a defendant's silence at or near the time of his arrest is limited to comments on the defendant's *silence,* and simply is not applicable when the defendant in fact has made a statement. *State v. Deatore, supra,* 70 *N.J.* at 108, 358 *A.*2d 163 (distinguishing its application from "a situation where a defendant did make a statement at or near arrest, which is inconsistent with his trial testimony, or where conduct (as distinct from silence) at the time of the crime or thereafter is inconsistent with the story told at trial."); *State v. Lyle, supra,* 73 *N.J.* at 421, 375 *A.*2d 629 (Conford, P.J.A.D, Temporarily Assigned, dissenting) ("Our unanimous holding in *State v. Deatore, supra,* forbidding comment by the State on defendant's silence was expressly confined to silence, the opinion noting that the ruling was not applicable when the defendant made a statement."); *State v. Brown, supra,* 118 *N.J.* at 613, 573 *A.*2d 886 ("[E]vidence of pre-arrest silence, particularly in the absence of official interrogation, does not violate any right of the defendant involving self-incrimination" and "pre-arrest silence may be admitted for impeachment purposes provided no governmental compulsion is involved."). Indeed, not only does *State v. Deatore* expressly exempt a defendant's statements from its reach,

*State v. Deatore* tells us that "cross-examination or rebuttal testimony with respect to prior *statements* inconsistent with the exculpatory story told at trial" are proper. *State v. Deatore, supra,* 70 *N.J.* at 119, 358 *A.*2d 163 (citation omitted).

A distillation of *Ripa, Deatore, Lyle* and *Brown* produces a straightforward and logical matrix: (1) a defendant may be impeached with his statements, be they either pre- or post-arrest; (2) a defendant may be impeached by his pre-arrest silence if there is no governmental compulsion involved; (3) a defendant may not be impeached with his silence "at or near" the time of his arrest whether or not governmental compulsion is involved; and (4) a defendant may never be impeached with his post-arrest silence.

### III.

The application of this construct to this case leads to a conclusion different from that reached by the majority regarding Sergeant DeLuccia's testimony concerning the statements defendant made to Sergeant DeLuccia when defendant entered police headquarters and accused the victim, M.M., of harassing defendant's brother and sister. Because these were defendant's statements, and not silence, they are, by definition, outside the ambit of the *State v. Deatore* prohibition against comments concerning defendant's silence "at or near" the time of his arrest. Therefore, in my view, the prosecution properly elicited Sergeant DeLuccia's testimony concerning what defendant did or did not say, and was similarly entitled to comment on that testimony when addressing the jury in summation.

The opposite result obtains with respect to Officer DeLucca's testimony, and the prosecutor's argument based thereon, concerning defendant's silence after he was escorted to the captain's office and interrogated by Officer DeLucca. At that point—until the time defendant was arrested and *Miranda* warnings administered—defendant was under a custodial interrogation and governmental compulsion and, hence, his silence could not be used

against him. *State v. Brown, supra,* 118 *N.J.* at 613, 573 *A.*2d 886. Of course, once defendant was arrested and the required *Miranda* warnings were administered, no testimony or comment concerning defendant's post-arrest silence were permissible.

I, therefore, concur in the result obtained by the majority on this issue solely because the testimony of Officer DeLucca and the prosecutor's comments based on that testimony constituted improper testimony and comments based on defendant's silence "at or near" the time of his arrest. However, to the extent the majority's opinion can be read as barring the prosecution at a retrial from eliciting the same testimony earlier elicited from Sergeant DeLuccia and fairly commenting thereon in summation, such a reading is clearly overbroad and should be rejected.

## IV.

I also concur in the majority's separate conclusions that the trial court had a rational basis to instruct the jury on the charged offense of aggravated criminal sexual contact and the lesser-included offense of sexual contact; that any seeming inconsistency between the verdict acquitting him of the sexual assault charges and convicting him of sexual contact did not warrant dismissal; and that the Appellate Division's entry of a judgment of acquittal on the sexual contact charge should be vacated and the case remanded for a new trial on the charge of criminal sexual contact.

*For affirmance in part/reversal in part/remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE, and RIVERA–SOTO—7.

*Opposed*—None.